MILLION YOUTH MARCH,
INC., Plaintiff,

v.

Howard SAFIR, Commissioner of the New York City Police Department, the City of New York, and Rudolph Giuliani, Mayor of the City of New York, Defendants.

No. 98 CIV. 5946(LAK).

United States District Court,
S.D. New York.

Sept. 4, 1998.

336

Michael W. Warren, Brooklyn, NY, Roger S. Wareham, New York City, for Plaintiff.

Michael D. Hess, Corporation Counsel of the City of New York, Daniel S. Connelly, Robin Binder, Florence A. Hutner, New York City, for Defendants.

Christopher Dunn, Norman Siegel, Arthur Eisenberg, New York Civil Liberties Union Foundation, for Amicus Curiae.

## MEMORANDUM OPINION (WITH PRELIMINARY INJUNCTION)

KAPLAN, District Judge.

This case poses a problem as old as the republic. Plaintiff seeks to conduct a large event in Harlem which it describes as a First Amendment-religious-political event and which is aimed chiefly at African–American youth. Persons associated with it reportedly have made exceptionally biased and bigoted remarks about another group in our society. The City of New York, citing health and safety concerns, has denied a permit necessary for plaintiff's event. Plaintiff claims that the City's stated reasons for its actions are pretextual and that its actions are the product of bias against the plaintiff or the reported views of its associates. The question presented is whether plaintiff has a constitutional right to go ahead with its plans.

*Facts*

*Plaintiff and the Proposed Event*

Plaintiff Million Youth March, Inc. ("MYM"), a non-profit organization, sought a permit from agencies of the City of New York ("City") to hold a rally on the 29 blocks of Malcolm X Boulevard from 118th Street to 147th Street on September 5, 1998 from 7:00 a.m. until 7:00 p.m.[1] "featur[ing] youth and adult speakers who are concerned about improving the conditions of their people."[2] According to the complaint, MYM calls for, *inter alia,* the "elimination of police brutality and misconduct; an end to the violence and conflict in communities of color; business and economic development for persons of African descent; reparations for descendants of slaves; jobs for youth; the reestablishment of financial support for educational *programs for students;* and the establishment of 'think tanks' amongst the youth for the purpose of creating solutions to the many problems that afflict African communities in New York and around the country."[3] MYM contends that "it is imperative that the event occur" in Harlem due to the expected attendees' "historical, cultural, religious and emotional ties" to Harlem, Harlem's central location and its "national and international reputation as the Mecca for people of African descent."[4]

1. Cpt. ¶¶ 18–19, 23; Tr., 8/20/98 at 17.

2. Cpt. ¶ 17.

3. Cpt. ¶ 20 & Ex. A.

4. Cpt. ¶ 24.

The anticipated size of the proposed event has been a moving target. Initially, plaintiff asserted that 1 to 3 million people would attend,[5] although that represented an effort to promote the event far more than any reasoned estimate. As will appear, the City relied upon that estimate in denying the requested relief. Now, however, plaintiff estimates that 100,000 to 170,000 people will participate in the rally,[6] an estimate that the City derides as an understatement.[7] The truth, of course, is that no one really knows. The size of the turnout doubtless will depend upon a host of factors including plaintiff's organizational and promotional activities, which cannot be assessed on this record, the weather, and the extent of the publicity generated by the political controversy surrounding the event, a controversy of which this lawsuit is a part.

### The Permit Applications

MYM submitted several applications for permits to the defendants. The first, received on November 21, 1997 by the City's Department of Parks and Recreation ("DPR"), requested approval to hold an "Educational—First Amendment" event on September 19, 1998 in Central Park, Randall's Island or in an unspecified "street."[8] On January 22, 1998, DPR, through Borough Commissioner Adrian Benape, notified MYM by letter that the application for Randall's Island was approved but that the application for Central Park was denied due to "construction taking place on the North Meadow."[9]

MYM then submitted two applications on January 26, 1998 to the Street Activity Permit Office ("SAPO") of the Community Affairs Unit ("CAU") of the Office of the Mayor.[10] Both requested permits for a "1st Amendment Educational Event." One applied for Malcolm X Boulevard between 110th and 145th Streets and the other requested Eastern Parkway from Flatbush to Utica Avenues, but both indicated a date of September 19, 1998. On February 25, 1998, however, MYM informed CAU Assistant Commissioner Mildred Duran by phone of its desire to change the date of the applications to September 5, 1998.[11]

Duran notified MYM by letter dated March 4, 1998 that the SAPO applications had been denied due, among other things, to construction on a portion of Malcolm X Boulevard and a West Indian Children's Day Carnival on Eastern Parkway on September 5, 1998.[12] MYM promptly appealed the decision to CAU Commissioner Rosemarie O'Keefe.[13]

After O'Keefe informed MYM that "there are several issues and concerns that must be addressed before we may proceed with your proposal for the September 5th Million Youth March,"[14] MYM representatives met with CAU/SAPO, the Police Department and the Law Department on April 2, May 1, and May 20, 1998. Ultimately, however, CAU denied the requested permit for the Malcolm X Boulevard location on September 5, 1998 in a letter dated June 9, 1998. It gave several reasons.

First, CAU asserted that September 5, 1998 would be inappropriate "because it falls during the Labor Day weekend … when there are numerous other activities on the City's streets and the City parks are at maximum utilization," in particular, the "West Indian Parade and similar activities which have been held on Labor Day weekend

---

5. Tr., 8/20/98 at 11–12.

6. Tr., 8/26/98 at 48.

7. *See* Def. Mem. at 12 (characterizing plaintiff's contention as "convenient[ ]" and inconsistent with its recent public statements).

8. Ct. Ex. A.

9. *Id.*

10. DX 8, DX 9.

11. Ct. Ex. A.

12. *Id.*; DX 4.

13. Ct. Ex. A; PX A.

14. Ct. Ex. A.

for over 25 years."[15] The letter stated also that Malcolm X Boulevard between 110th and 147th Streets is "unsuitable for a thirteen hour stationary rally with a crowd" of the size proposed by MYM due to "repair work" from 110th to 125th Streets and because a crowd of the anticipated size could not be "physically or safely contained" in the proposed area and would "cause[ ] problems of access for emergency vehicles, and excessive traffic congestion."[16]

CAU rejected MYM's alternate proposals for Fifth Avenue and Eastern Parkway, stating that those areas are "similarly inappropriate for a stationary rally of the size and length" proposed. Finally, the letter stated that "large parks are preferable" for such events, but that Central Park was unavailable because the North Meadow is being reseeded until the year 2000. The letter instead proposed that MYM hold its rally in Van Cortlandt Park in the Bronx because of its accessibility to public transportation, major thoroughfares and sanitation facilities, or on Randall's Island, which contains an amphitheater, soccer field and large parking lot. It suggested September 19, 1998 from 12 noon to 5:00 p.m. without justifying the reduction from the 7:00 a.m. to 7:00 p.m. period requested by MYM.[17] In closing, the letter stated that "[w]e nevertheless continue to be willing to discuss with you the viability of this date and these locations for your event."[18]

Whether or not talks continued after MYM received the June 9th letter is a matter of contention among the parties. MYM asserts that several meetings were planned and then canceled by the defendants but that MYM continued to hope that the September 5th rally in Harlem would be approved. The defendants deny that any subsequent meetings or discussions occurred.[19] In the last

analysis, the issue is immaterial to this decision.

## The Controversy

As the negotiations over the rally location and time stalled, controversy concerning the event erupted in the media.

Khalid Muhammad, a former Nation of Islam spokesperson and central organizer of the event, previously had made a number of outrageous, inflammatory and prejudiced remarks, such as a description of a Jew as a "hooked-nose, bagel-eating, lox-eating, perpetrating-a-fraud so-called Jew who just crawled out of the ghettos of Europe a few days ago."[20] On August 6, 1998, Mayor Rudolph Giuliani was quoted as stating that he believed the event to be a "hate march." As reported by the press, the Mayor declared that "he won't allow 'a hatemonger to take over our City in any substantial respect.' "[21] Plaintiff asserts that the denial of the permit reflects mayoral antipathy to the content or message of the proposed event or, at least, to Mr. Muhammad.

## The Litigation

Plaintiff filed this action on August 20, 1998 and at the same time moved for a preliminary injunction ordering the defendants to permit it to conduct its rally on September 5, 1998 on Malcolm X Boulevard from 118th to 147th Streets.[22] The Court held a conference with counsel later that day and an evidentiary hearing on August 26, 1998. It rendered a bench opinion and signed a preliminary injunction at the end of the hearing with the reservation that this opinion would follow.

## Discussion

### Preliminary Injunction Standard

■■■ "In order to justify the award of a preliminary injunction, the moving party

**15.** PX D.

**16.** *Id.*

**17.** *Id.*

**18.** *Id.*

**19.** Tr., 8/20/98 at 13 (June 9th "was the final official word from the city, your Honor. I think there was probably a request—I think there was

a request for an additional meeting, I'm not sure of that, but nothing—I know no other meetings or discussions took place.").

**20.** *The Hate Virus*, N.Y. TIMES, Aug. 10, 1998, at A15.

**21.** *Mayor: I Won't Let 'Hatemonger' Call the Shots on March*, N.Y. POST, Aug. 8, 1998, at 16.

**22.** Cpt. at 8.

must first demonstrate that it is likely to suffer irreparable harm in the absence of the requested relief."[23] Once the likelihood of irreparable harm has been demonstrated, a movant ordinarily is entitled to relief if it demonstrates "either (1) 'a likelihood of success on the merits' or (2) 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly' in the movant's favor."[24] Where, however, a movant seeks to enjoin "government action taken in the public interest pursuant to a statutory or regulatory scheme," it may succeed only by demonstrating a likelihood of success on the merits in addition to irreparable harm.[25] Further, if "the injunction sought 'will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits,'" the showing of a likelihood of success must be "clear" or "substantial."[26]

■ In this case, plaintiff seeks a preliminary injunction "ordering the defendants to permit the plaintiff to conduct its September 5, 1998 rally in Harlem on Malcolm X Blvd. between 118th Street and 147th Street commencing at 7:00 a.m. and concluding at 7:00 p.m." and "enjoining the defendants from enforcing their policy limiting First Amendment activity" at that time and place.[27] Plaintiff thus seeks to enjoin governmental action ostensibly taken in the public interest pursuant to a regulatory or statutory scheme[28] and therefore must demonstrate a likelihood of success on the merits in order to establish its right to a preliminary injunction. Moreover, it must demonstrate a clear or substantial likelihood because, in light of the proximity of this motion to the requested date of the event, the grant of preliminary relief would provide plaintiff with substantially all the relief that it seeks and the relief could not be undone by a subsequent trial on the merits.[29] Hence, in order to obtain a preliminary injunction, plaintiff must establish (1) a likelihood of irreparable harm, and (2) a clear or substantial likelihood of success on the merits.

### Irreparable Harm

■ "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[30] Normally, then, plaintiff's allegation that a preliminary injunction is necessary to forestall the imminent loss of its First Amendment freedoms due to defendants' actions would suffice to establish a likelihood of irreparable harm.[31] Before reaching this conclusion, however, the Court must consider the impact, if any, of plaintiff's delay in seek-

---

23. *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir.1996) (citing *Sperry Int'l Trade, Inc. v. Government of Israel*, 670 F.2d 8, 11 (2d Cir.1982)).

24. *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) (quoting *Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775, 779–80 (2d Cir.1994)).

25. *Id.*

26. *Id.* (quoting *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)).

27. Cpt. at 8.

28. *Cf. Housing Works, Inc. v. Safir*, No. 98 Civ. 4994(HB), 1998 WL 409701, at * 2 (S.D.N.Y. July 21, 1998) (plaintiff challenging denial of permission to use front steps of City Hall for press conference involving more than twenty-five attendees); *Irish Lesbian and Gay Organization v. Giuliani*, 918 F.Supp. 732, 739–40 (S.D.N.Y. 1996) (hereinafter *"ILGO 1996"*) (challenge to denial of parade permit).

29. *See ILGO 1996*, 918 F.Supp. at 740.

In the alternative, the Court concludes that the clear or substantial likelihood standard is applicable because plaintiff requests the Court to mandate the issuance of a permit, altering the status quo. *See id.; cf. Tom Doherty*, 60 F.3d at 34 (noting the ambiguity of the distinction between mandatory and prohibitory injunctions).

30. *Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)); *see also Bery*, 97 F.3d at 693 ("Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction.")

31. *See, e.g., ILGO 1996*, 918 F.Supp. at 739; *Irish Lesbian and Gay Organization v. Bratton*, 882 F.Supp. 315, 319 (S.D.N.Y.1995) [hereinafter *"ILGO 1995"*].

ing injunctive relief.[32]

The Second Circuit observed in *Citibank, N.A. v. Citytrust*[33] that "[p]reliminary injunctions generally are granted on the theory that there is an urgent need for speedy action to protect the plaintiffs' rights" and that "[d]elay in seeking enforcement of those rights ... tends to indicate at least a reduced need for such drastic, speedy action."[34] While such an inference is reasonable where, as in the trademark infringement context,[35] circumstances are such that the allegedly irreparable harm is being experienced during the period of delay, it is less probative of a lack of urgency where, as here, the harm largely is prospective and will arise from a discrete future event. In any event, this case does not present facts upon which plaintiff's delay alone warrants a conclusion that irreparable harm is unlikely, particularly in light of the constitutional nature of plaintiff's claim.[36]

■ Plaintiff's delay is more appropriately viewed as an equitable factor possibly indicative of conduct warranting application of the doctrine of laches.[37] "Generally, laches is applied where it is clear that a plaintiff unreasonably delayed in initiating an action and a defendant was prejudiced by the delay."[38] In this case, plaintiff delayed ten weeks after the City on June 9, 1998 unmistakably closed the door on the alternative plaintiff de-

mands—Malcolm X Boulevard on September 5. Moreover, defendants arguably have suffered some prejudice by being forced to prepare for and contest litigation involving a significant constitutional issue in a short period of time.[39] The Court concludes, however, that this prejudice is minimal. Moreover, it must be borne in mind that the outcome of this litigation may affect the expressive rights of a large number of people other than the plaintiff and that those individuals are not responsible for any undue delay by the event organizer. In consequence, the Court concludes that the delay by the plaintiff and any modest prejudice suffered by the defendants are not sufficient to deny relief based on laches.

Defendants argue also that injunctive relief should be denied because persons allegedly affiliated with plaintiff have threatened in the media to go forward with the event regardless of this Court's decision. Thus, defendants contend, plaintiff has engaged in inequitable conduct disqualifying it from equitable relief.

The Court does not condone lawless action. At the same time, the Court recognizes that this controversy takes place against a backdrop of overheated political rhetoric. The public interest will best be served by a decision resolving this controversy on its consti-

**32.** *See Tom Doherty*, 60 F.3d at 39 ("A district court should generally consider delay in assessing irreparable harm.")

**33.** 756 F.2d 273 (2d Cir.1985).

**34.** *Id.* at 276.

**35.** The rule stated in *Citibank*, a trademark infringement case, was inspired at least in part by language in *Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190 (2d Cir.1971), declaring that where a trademark infringement plaintiff establishes a likelihood of success on the issue of likelihood of confusion, a finding of irreparable harm "almost inevitably flows." *See Citibank*, 756 F.2d at 276 (quoting *Omega Importing*, 451 F.2d at 1195). *Compare Tom Doherty*, 60 F.3d at 39.

**36.** This is not to say that delay, even unaccompanied by prejudice, never would justify denial of interlocutory relief in a case asserting constitutional claims. *Cf. Citibank*, 756 F.2d at 276 (significant delay in trademark case capable of

justifying denial of preliminary injunction). As the Second Circuit has indicated, the courts have an independent institutional interest in ensuring that matters are presented to them in a timely manner so that they may receive the careful consideration they deserve.

**37.** *Cf. Tom Doherty*, 60 F.3d at 39. "Delay is typically relevant to both irreparable harm and to laches, although the latter doctrine relates only to permanent relief." *Id.* Where, as here, the relief sought via preliminary injunction in practical effect will give the plaintiff substantially all the relief sought in the complaint, it is reasonable to consider the applicability of the laches doctrine in the preliminary injunction context.

**38.** *Robins Island Preservation Fund, Inc. v. Southold Development Corp.*, 959 F.2d 409, 423 (2d Cir.1992), *cert. denied*, 506 U.S. 1001, 113 S.Ct. 603, 121 L.Ed.2d 539 (1992).

**39.** *See WPIX v. League of Women Voters*, 595 F.Supp. 1484, 1494 (S.D.N.Y.1984).

tutional merits, without regard to statements in the press.

## *Likelihood of Success on the Merits*

Plaintiff asserts that defendants' permit policy for events such as this is unconstitutional both on its face and as applied to them.[40]

 The constitutional framework governing this dispute is well-settled. Malcolm X Boulevard, like any public street, is a traditional public forum for the exercise of First Amendment rights.[41] The same is true of its adjoining public sidewalks.[42] Thus, while it is beyond dispute that municipalities have the right "to regulate the use of city streets and other facilities to assure the safety and convenience of the people in their use,"[43] that right may not be exercised so as to abridge or deny First Amendment rights.[44] The Supreme Court has sought to resolve the tension between these competing interests by declaring that, generally,

> "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions '[1] are justified without reference to the content of the regulated speech, [2] that they are narrowly tailored to serve a

significant governmental interest, and [3] that they leave open ample alternative channels for the communication of the information.' "[45]

MYM contends that defendants' licensing scheme as applied here was not a reasonable time, place, and manner restriction. Moreover, MYM argues that defendants' licensing scheme is facially unconstitutional because it vests unfettered discretion in the government officials that implement it. The Court first considers plaintiff's facial challenge.

### A. *Facial Validity of the Licensing Scheme*

 " '[M]any decisions of the [Supreme] Court over the last [50] years [have held] that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional.' "[46] The rationale for this rule is clear: because a licensing scheme lacking such safeguards gives discretion to the government official charged with implementing the scheme, there is nothing to prevent that official from engaging in content-based censorship.[47]

---

**40.** Pl. Mem. at 4–9.

**41.** Justice Roberts gave this concept its classic expression in *Hague v. C.I.O.*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), where he stated that "[w]henever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Id.* at 515–16, 59 S.Ct. 954. *See also Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 152, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).

**42.** *See Schenck v. Pro–Choice Network of Western New York*, 519 U.S. 357, 117 S.Ct. 855, 867, 137 L.Ed.2d 1 (1997).

**43.** *Cox v. State of Louisiana*, 379 U.S. 536, 554, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *see also Shuttlesworth*, 394 U.S. at 152, 89 S.Ct. 935. "The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of

travel on the streets is a clear example of governmental responsibility to insure this necessary order." *Cox*, 379 U.S. at 554, 85 S.Ct. 453.

**44.** *See Hague*, 307 U.S. at 516, 59 S.Ct. 954.

**45.** *Ward v. Rock Against Racism*, 491 U.S. 781, 789, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)).

The Court observes that time, place, and manner analysis differs little if at all from the analysis of restrictions on expressive conduct under *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). *See Clark*, 468 U.S. at 298, 104 S.Ct. 3065.

**46.** *Nichols v. Village of Pelham Manor*, 974 F.Supp. 243, 250 (S.D.N.Y.1997) (quoting *Shuttlesworth*, 394 U.S. at 150–51, 89 S.Ct. 935).

**47.** *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 649, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *Cox*, 379 U.S. at 556–58, 85 S.Ct. 453.

"Even when the use of its public streets and sidewalks is involved … a municipality may not

Here, the parameters of the City's licensing scheme are not entirely clear. Were the event a "procession, parade or race," the licensing determination would have been made by the Police Department pursuant to Section 10–110 of the New York City Administrative Code.[48] Were the event a "street activity" such as a street fair or block party, the determination would have been made by CAU's SAPO pursuant to the Rules of the Street Activity Permit Office Relating to Applications, Fees and Charges ("Activity Rules").[49] But this event is not exactly either. In defendants' words, "plaintiff's application for a permit to conduct a political, religious and education rally in the Harlem streets had elements of both a parade and a street activity."[50] In consequence, plaintiff's application, in the last analysis, was considered on an *ad hoc* basis: the Police Department reviewed plaintiff's application "in conjunction with CAU,"[51] while the rejection letter was issued on CAU letterhead and was signed by Mildred E. Duran, an Assistant Commissioner with SAPO.[52] Until closing argument, the City gave no clear indication of

empower its licensing officials to roam essentially at will, dispensing or withholding permission *to speak, assemble, picket, or parade according* to their own opinions regarding the potential effect of the activity in question on the 'welfare' ... of the community." *Shuttlesworth*, 394 U.S. at 153, 89 S.Ct. 935.

**48.** The Ordinance reads:

" § 10–110 Processions and Parades
"a. Permits. A procession, parade, or race shall be permitted upon any street or in any public place only after a written permit therefore has been obtained from the police commissioner. Application for such permit shall be made in writing, upon a suitable form prescribed and furnished by the department, not less than thirty-six hours previous to the forming or marching of such procession, parade or race. The commissioner shall, after due investigation of such application, grant such permit subject to the following restrictions:
"1. It shall be unlawful for the police commissioner to grant a permit where the commissioner has good reason to believe that the proposed procession, parade, or race will be disorderly in character or tend to disturb the public peace;
"2. It shall be unlawful for the police commissioner to grant a permit for the use of any street or any public place, or material portion thereof, which is ordinarily subject to great congestion or traffic and is chiefly of a business or mercantile character, except, upon loyalty day, or upon those holidays or Sundays when places of business along the route proposed are closed, or on other days between the hours of six-thirty post meridian and nine ante meridian;
"3. Each such permit shall designate specifically the route through which the procession, parade or race shall move, and it may also specify the width of the roadway to be used, and may include such rules and regulations as the police commissioner may deem necessary;
"4. Special permits for occasions of extraordinary public interest, not annual or customary, or not so intended to be, may be granted by the commissioner for any street or public place, and for any day or hour, with the written approval of the mayor;

"5. The chief officer of any procession, parade or race, for which a permit may be granted by the police commissioner, shall be responsible for the strict observance of all rules and regulations included in said permit.
"b. Exemptions. This section shall not apply:
"1. To the ordinary and necessary movements of the United States army, United States navy, national guard, police department and fire department; or
"2. To such portion of any street as may have already been, or may hereafter be duly, set aside as a speedway; or
"3. To processions or parades which have marched annually upon the streets for more than ten years, previous to July seventh, nineteen hundred fourteen.
"c. Violations. Every person participating in any procession, parade or race, for which a permit has not been issued when required by this section, shall, upon conviction thereof, be punished by a fine of not more than twenty-five dollars, or by imprisonment for not exceeding ten days, or by both such fine and imprisonment."

**49.** 50 Rules of the City of New York ("RCNY") § 1–01 *et seq.*

**50.** Def. Mem. at 2, n. 3.

**51.** *Id.*

During a preliminary hearing before the Court on August 20, 1998, however, confusion reigned on this issue. Among the agencies named as potentially responsible for considering MYM's application were the Parks Department (to whom MYM originally applied), the NYPD, the CAU, and the transportation department. Tr., 8/20/98 at 22–25. Defendants eventually asserted that, in order to obtain a permit to hold the March on Malcolm X Boulevard, permission from the NYPD would be sufficient. *Id.* at 25.

**52.** The application to hold the march on Malcolm X Boulevard was submitted to SAPO on January 26, 1998. Ct. Ex. A; DX 8. CAU Assistant Commissioner Mildred Duran denied the SAPO applications on March 4, 1998, specifically advising of the right to appeal under the Activity

what, if any, statute or rule governed its determination. It then asserted that it acted under Section 10–110, although that is inconsistent with earlier correspondence.[53]

The lack of any statutory or regulatory framework directly applicable to this hybrid event itself is problematic. As indicated above, the City's action must be taken pursuant to narrow, definite and objective standards in order to pass muster as a reasonable regulation of the time, place and manner of constitutionally protected expression. Indeed, the *ad hoc* approach taken here is similar to that struck down by the New York Court of Appeals in *City of New York v. American School Publications, Inc.*,[54] where the court concluded that the First and Fourteenth Amendments precluded the City from denying the use of free distribution bins to the plaintiff because its decision to do so was not made pursuant to a properly drawn ordinance, but was based "presumably on the private criteria of a" City official.[55] Hence, the lack of any such rules for events such as this requires the conclusion that the First and Fourteenth Amendments invalidate the City's action here.

The same result would follow even if the Court were to assume that the City acted pursuant to both Section 10–110 of the Administrative Code and SAPO's Activity Rules or the Activity Rules alone. If both were applied, the official who denied the permit would have been obliged, or at least permitted, to do so under the criteria set forth in either provision. Hence, if either provision conferred impermissibly broad discretion, the

scheme would run afoul of the First and Fourteenth Amendments.

SAPO's Activity Rules provide for licensing determinations by SAPO's director upon applications submitted to SAPO either directly or by local community boards.[56] A permit may be granted only to "a community-based, not-for-profit organization, association or the like, which has an indigenous relationship to the specific street or community or both, for which the event is proposed and which demonstrates that it has the support of the community."[57] Permits for "business celebrations or the like may, at the discretion of the Director of SAPO, be issued to individuals or commercial entities."[58] The community boards are given discretion to recommend approval or denial of applications submitted to them, or to recommend conditions that the board "deems to be in the best interest of the area of the proposed street activity or of the community district."[59] Applicants may comment on these recommendations to the director,[60] and the director must notify the applicant and the board of its decision within a specified time period.[61] The director is entitled in any event to solicit commentary on the application from other municipal agencies, including the Police Department, and must take these comments under consideration in reaching his or her decision.[62] The director is authorized to deny, condition the issuance of, or revoke an application on any or all of the following grounds:

"(1) The Police Department . . . or any other appropriate agency which was forwarded a copy of a street activity permit application for comment, has notified the

Rules. DX 4. The next day, plaintiff appealed this decision to CAU Commissioner Rosemarie O'Keefe. PX A. Duran, during a March 5 telephone conference with plaintiff's attorney, recommended that plaintiff seek approval from the Police Department. Ct. Ex. A. After this call, subsequent meetings were held between representatives of plaintiff, CAU/SAPO, the Police Department, and the City's Law Department. *Id.* The final letter of denial, as noted previously, was issued on June 9, 1998. PX D.

53. DX 4 (advising of right to appeal under Activity Rules).

54. 69 N.Y.2d 576, 516 N.Y.S.2d 616, 509 N.E.2d 311 (1987).

55. *Id.* at 582, 516 N.Y.S.2d at 618, 509 N.E.2d 311; *see also New Alliance Party v. Dinkins*, 743 F.Supp. 1055, 1064–65 (S.D.N.Y.1990).

56. 50 RCNY § 1–03(c).

57. *Id.* § 1–03(b).

58. *Id.*

59. *Id.* § 1–03(d).

60. *Id.* §§ 1–04, 1–05.

61. *Id.* § 1–05(b).

62. *Id.* §§ 1–06, 1–07(a).

Director of SAPO of its disapproval and the reasons therefor; or

"(2) the proposed activity, when considered in conjunction with other proposed activities, would produce an excessive burden on the community, City services, or City personnel; or

"(3) the information provided on the application or forms or documentation required to be submitted is false, misleading, incomplete or inaccurate; or

"(4) approval of the application *is not in the best interest of the community, City or general public for reasons that may include, but are not limited to, lack of good character, honesty, integrity or financial responsibility of the sponsor.* If the Director determines that the application shall be denied on the ground that the sponsor lacks good character, honesty, integrity or financial responsibility, the Director shall notify the applicant that the application has been denied and shall specify the reason for such denial. The applicant and/or sponsor may thereafter respond to the Director's determination and appeal such denial pursuant to the provisions of § 1–08." [63]

Appeal is to the Commissioner of CAU, who is under no obligation to consider any particular factors in assessing the merits of the appeal.[64]

---

■ The Activity Rules vest unconstitutional discretion in the director and commissioner to determine which speakers shall be licensed for street activity and which shall not. Indeed, Section 1–07(c)(4), which allows licenses to be denied in the "best interest" of the community for unlisted or listed reasons—including the good character of the event's sponsor—is a virtual prescription for unconstitutional decision making of the sort specifically struck down by the Supreme Court in *Shuttlesworth.*[65] Like the ordinance rejected in *Shuttlesworth,* the Activity Rules permit these officials to make licensing decisions "guided only by their own ideas" of what constitutes the good of the community.[66] Such untrammeled discretion cannot stand against the First Amendment.[67] The Activity Rules are unconstitutional on their face.[68]

## B. As–Applied Challenge

Even if the applicable licensing regulations were facially constitutional, the manner in which the City enforced its policy in this case quite likely was not.

■ "In examining the constitutionality of a regulation that impinges on First Amendment activity, courts will apply a strict scrutiny analysis when the regulation dis-

---

**63.** *Id.* § 1–07(c) (emphasis added).

**64.** *Id.* § 1–08.

**65.** Section 1–03(b), which provides the director with unlimited discretion to approve or deny applications from individuals and commercial entities, and requires that non-profit entities be community based, have an indigenous relationship with the community, and demonstrate that they have support from the community, similarly is problematic. In the former category, the government is granted unlimited discretion, which is impermissible under *Shuttlesworth,* 394 U.S. at 150–51, 89 S.Ct. 935. The latter category is flawed because the First Amendment does not permit government to condition a speaker's access to a public forum on whether the speaker has support in or an indigenous relationship with the local community. *See, e.g., Police Department v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (cannot condition access on acceptability of speaker's views); *NAACP v. Button,* 371 U.S. 415, 445, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (same).

**66.** *Shuttlesworth,* 394 U.S. at 150, 89 S.Ct. 935.

**67.** Nor is it an answer to argue that the "policy" was constitutionally applied in this case, even assuming that it was in this instance. "It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 129, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).

**68.** In view of this conclusion, the Court has no occasion to consider the facial validity of N.Y.C. AD. C. § 10–110. *Cf. Irish Lesbian and Gay Organization v. Giuliani,* 143 F.3d 638, 647 (2d Cir.1998) ("If section 10–110 is overly broad, or lacks procedural safeguards to prevent censorship, then any citizen of New York may challenge the law."); *MacDonald v. Safir,* No. 98 Civ. 2332(LBS), 1998 WL 318690 (S.D.N.Y. June 16, 1998) (upholding Section 10–110 against *Shuttlesworth* claim).

criminates on the basis of content, and a more lenient analysis to content-neutral regulations."[69] While content-based regulation almost always is constitutionally forbidden, "[a] content-neutral regulation may restrict the time, place and manner of protected speech, provided it is 'narrowly tailored to serve a significant governmental interest' and 'leave[s] open ample alternative channels for communication.'"[70] The Court, however, need not consider whether the defendants' action in this case was content-based or content-neutral because the Court finds that the denial of a permit in this instance was constitutionally infirm even under the less exacting standards applicable to a content-neutral restriction.[71]

### 1. Narrow Tailoring

The plaintiff has conceded the significance of the asserted government interest, the "regulation of street activity to protect the public safety."[72] The real issue then is whether the defendants' action—a refusal to grant a permit for Malcolm X Boulevard on September 5, 1998—was narrowly tailored to advance that interest.

In *Ward v. Rock Against Racism*,[73] the Supreme Court considered the "narrow tailoring" prong of the time, place and manner test and concluded that, although a city need not choose the "least restrictive or least intrusive means" of enforcing a content-neutral restriction, a restriction nevertheless "may not burden substantially more speech than is necessary to further the government's legitimate interests."[74]

The plaintiffs argue that the restriction inherent in the defendants' action burdens substantially more speech than necessary to regulate street activity and protect public safety. In particular, the plaintiff contends that numerous street events—including sta-

tionary rallies as large as, or larger than, this proposed event—are permitted in Manhattan, often at times as busy as the Labor Day weekend. The plaintiff cites as examples the rally for Nelson Mandela held in Harlem on June 21, 1990, which reportedly was attended by one hundred thousand or more people, and the World Series victory rally for the New York Yankees held in lower Manhattan in October 1996, which involved an estimate of over a million people, both of which occurred without incident.[75] Thus, the plaintiff asserts, as a matter of historical record, that the City's interests in regulating street activity, traffic congestion, emergency vehicle access permit a restriction far less burdensome than was imposed.

The Court agrees. While the City is not limited to the least restrictive means necessary to advance its interests, it is not free to impose a ban such as this without a persuasive showing that the event poses a significant threat to those interests. The Court has no doubt that the proposed event would require substantial effort on the part of the City to ensure the public health, safety and welfare. But the testimony at the evidentiary hearing persuades the Court that the task is well within the capabilities of the Police Department and the other relevant City agencies, even without imposing a least restrictive alternative standard.

To begin with, the City argues in some measure from the premise that the crowd drawn by this event will be in the range of 1 to 3 million, the doubtless hopeful and overly optimistic figure first put forward by its sponsor, or perhaps one of the smaller but nonetheless very large figures plaintiff has advanced at one time or another. But the defendants bear the burden of establishing that their time, place and manner restriction

**69.** *Bery v. City of New York*, 97 F.3d 689, 696 (2d Cir.1996); *see also (Turner Broadcasting System, Inc. v. Federal Communications Comm'n*, 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)).

**70.** *Bery*, 97 F.3d at 697 (quoting *Ward*, 491 U.S. at 791, 109 S.Ct. 2746).

**71.** *See id.*

**72.** Pl. Mem. at 8; Def. Mem. at 10.

**73.** 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

**74.** *Id.* at 799, 109 S.Ct. 2746.

**75.** *See* Cpt. ¶¶ 30–36.

is constitutional,[76] and they have failed to point to any proof in the record that the plaintiff's current estimate of 100,000 to 150,000 attendants—the low-end of the numbers put forth originally by plaintiff in its initial application—is erroneous. Indeed, there is no empirically based, reasoned estimate in the record to support the City's various arguments that presuppose a crowd in excess of the capacity of Malcolm X Boulevard.

Second, the City's arguments to some extent assume that the total attendance figure, whatever it proves to be, will be the number of persons present on Malcolm X Boulevard throughout all or most of the period of the event. Common sense suggests otherwise. In an event planned to last for the better part of twelve hours, it is entirely likely that people will drift in and out throughout the day and that the maximum number of people to be accommodated at any one time will be only a fraction of the total attendance figure. While the Court finds that the capacity of the relevant portion of Malcolm X Boulevard, after making due allowance for emergency access and other necessities, is closer to 135,000 people than to plaintiff's best case figure of 163,000,[77] there is no persuasive proof that more capacity will be required.

Far more important, the City has ample ability to deal with any problems of congestion, emergency access, overcrowding and fire risk that may arise while allowing the event to go forward in some form at this date and place. Plaintiff's submissions assume that 118th, 125th, 135th, 139th and 147th Streets will not be obstructed. The City may insist upon the reservation of an unobstructed lane on Malcolm X Boulevard for emergency vehicles and, indeed, unobstructed cross streets. And the Police Department

is fully capable of closing access to Malcolm X Boulevard and environs if its safe capacity is reached and directing any overflow crowd into nearby areas. It has done so with other events. Indeed, police officials indicated that the department could police the event with approximately 2,000 to 3,000 officers on each of two tours.[78] Moreover, despite repeated focus on the issue, the City declined to assert that it lacks the necessary personnel.

Lest there be any confusion on the point, this Court emphatically is *not* imposing any form of least-restrictive-alternative test on the City. What *Ward* prohibits is imposing a burden on "substantially more speech than is necessary to further the government's legitimate interests."[79] Here, the record shows that every one of the City's quite legitimate public health and safety concerns could have been dealt with while allowing the event to go forward, albeit perhaps not on precisely the basis that the organizers wish. For example, the City could have required provision of a clear lane for emergency equipment, insisted upon clearance for pedestrian traffic along building lines, precluded obstruction of intersections and the area around Harlem Hospital, and furnished adequate police personnel both to ensure proper traffic movement and to provide the ability to close off the area if the crowd exceeds that which safely can be accommodated. While some or all of these measures properly might have limited plaintiff's ability to express itself precisely as it wished—for example, by limiting the size of the crowd—the City chose instead to ban the event outright. In consequence, the City improperly has "regulate[d] expression in such a manner that a substantial portion of the burden on speech does not

**76.** See *Rock Against Racism v. Ward*, 658 F.Supp. 1346, 1358 (S.D.N.Y.1987) ("The city thus bears the burden of proving the crowd size limitation contained in the Guidelines is narrowly tailored to further a legitimate state purpose."), *aff'd in part and rev'd in part on other grounds*, 848 F.2d 367 (2d Cir.1988), *rev'd on other grounds*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *see also Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 428–30, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993).

**77.** Indeed, the commanding officer of the Police Department's Manhattan North command put the figure at 138,000. Tr., 8/26/98 at 159–60.

**78.** Tr., 8/26/98 at 172, 221–23, 229. Moreover, the Court finds that the Fire Department's concerns could be met by assigning adequate police to ensure access for fire equipment in case of emergency. *Id.* at 205–06.

**79.** 491 U.S. at 799, 109 S.Ct. 2746; *see Carew-Reid v. Metropolitan Transportation Authority*, 903 F.2d 914, 917–18 (2d Cir.1990).

serve to advance its goals." [80]

In view of the defendants' failure to demonstrate that this permit must be denied outright in order to protect public safety and its long history of successfully dealing with large and unpredictable events, this action was not narrowly tailored to the undeniably legitimate safety and health concerns the defendants have articulated.[81] Plaintiff therefore is substantially likely to prevail on its contention that the restriction as applied to the plaintiff is unconstitutional.

### 2. Ample Alternatives

It is not disputed that "[w]hether ample alternatives are available does not depend on the preference of the speaker for one method or another. [Plaintiff] has no constitutionally protected franchise on the forum of its choice." [82] It does not follow from this, however, that the plaintiff's preferred location is always irrelevant. The requirement that potential alternatives be "ample" requires a nuanced analysis that may take account of (1) the audience to which the speaker seeks to communicate [83] and (2) the

contribution of the desired location to the meaning of the speech.[84]

"The right of free speech is guaranteed every citizen that he may reach the minds of willing listeners and to do so there must be opportunity to win their attention." [85] This principle is well-established. In *City of Ladue v. Gilleo,*[86] for example, the Supreme Court struck down a municipal ordinance which precluded the posting of signs at residences. The Court noted in particular that the ordinance failed to leave open ample alternatives for speech because, *inter alia,* "a person who puts up a sign at her residence often intends to reach *neighbors,* an audience that could not be reached nearly as well by other means." [87] To similar effect is the Second Circuit's decision in *Bery,* which rejected a ban on the sale of art in public places in part on the ground that the alternatives left open to the artists—to display their wares from their homes or in galleries—did not afford them access to their target audience: persons who do not go to galleries but who might buy art if they encountered it on the street.[88] Similarly, in *New Alliance Par-*

---

**80.** *Id.*

**81.** *See, e.g., Housing Works v. Safir,* No. 98 Civ. 4994(HB), 1998 WL 409701, at *3 (S.D.N.Y. July 21, 1998) (finding numerical restriction on groups who may demonstrate on steps of city hall not narrowly tailored to safety and security concerns where similarly large groups have been permitted to demonstrate, without incident, in the past); *United Yellow Cab Drivers Ass'n v. Safir,* No. 98 Civ. 3670(RPP), 1998 WL 274295, at *3 (S.D.N.Y. May 27, 1998) (numerical limitation of 25 taxicabs in demonstration not narrowly tailored to interest in regulating traffic congestion where previous processions permitted in larger numbers of taxicabs in the past).

**82.** *ILGO 1996,* 918 F.Supp. at 744 (citing *Heffron,* 452 U.S. at 647, 101 S.Ct. 2559; *Harm Reduction Coalition v. Bratton,* No. 95 Civ. 3171(LAP), 1995 WL 271766, at *2 (S.D.N.Y. May 9, 1995)); *see Olivieri v. Ward,* 766 F.2d 690, 694 (2d Cir.1985).

**83.** *See, e.g., City of Ladue v. Gilleo,* 512 U.S. 43, 56, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994); *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 812, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *Heffron,* 452 U.S. at 655 n. 16, 101 S.Ct. 2559; *Kovacs v. Cooper,* 336 U.S. 77, 87, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (Reed, J.) (plurality); *Bery v. City of New York,* 97 F.3d 689, 698 (2d

Cir.1996); *Bay Area Peace Navy v. United States,* 914 F.2d 1224, 1229 (9th Cir.1990); *Nationalist Movement v. City of Boston,* 12 F.Supp.2d 182, 192–93 (D.Mass.1998).

**84.** *See, e.g., City of Ladue,* 512 U.S. at 56, 114 S.Ct. 2038; *Nationalist Movement,* 12 F.Supp.2d at 192–93; *cf. Women Strike for Peace v. Morton,* 472 F.2d 1273, 1287 (D.C.Cir.1972) (Wright, J.).

**85.** *Kovacs v. Cooper,* 336 U.S. 77, 87, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (Reed, J.) (plurality).

**86.** 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36.

**87.** *Id.* at 57, 114 S.Ct. 2038; *see also Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 814, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (ample alternatives analysis of whether protesters could still be seen and heard by their target audience despite restriction was "classic timeplace-and-manner-regulation"); *cf. Taxpayers for Vincent,* 466 U.S. at 812, 104 S.Ct. 2118 (in upholding regulation, Court fond it significant that there had been no finding that the foreclosed medium threatened plaintiff's ability to communicate effectively); *Heffron,* 452 U.S. at 655, 101 S.Ct. 2559 (foreclosed medium did not exclude plaintiff from communicating in the desired forum).

**88.** 97 F.3d 689, 698.

ty v. Dinkins,[89] Judge Leisure concluded that relegating demonstrators to an area essentially out of sight of Gracie Mansion did not provide an ample alternative to the plaintiffs, who wished to convey their protests to the Mayor.[90]

Courts in other districts have reached comparable conclusions. In *Nationalist Movement v. City of Boston*,[91] the district court recently held that Boston's refusal to permit the plaintiff to hold a parade through South Boston along the route traditionally taken by the canceled St. Patrick's Day parade could not be justified because no available alternatives adequately satisfied the plaintiff's purpose to communicate to the residents of South Boston.[92] Likewise, in *Bay Area Peace Navy v. United States*,[93] the Ninth Circuit struck down a 75–yard safety zone erected around a reviewing stand at a naval parade on the ground that plaintiff had no ample alternative allowing it to speak to its desired audience, the reviewers, in light of the facts that the plaintiff's signs could not be read by the reviewers from beyond the 75–yard zone and the reviewers were not accessible by hand-billers on the ground.[94] For the same reason, the court in *Students Against Apartheid Coalition v. O'Neil*[95] rejected a university's attempt to prevent student protesters from erecting protest shanties within sight of the university's board of visitors.[96]

In this case, plaintiff desires to communicate its views not merely to the participants in the event, but also to the residents of Harlem: "the rally will have a more significant and greater impact if convened in the community where the residents are subjected to the very conditions that the march and rally seek to address."[97] Defendants have denied it a permit that would permit it to do so and offered instead to allow it to use Randall's Island.[98] And while plaintiff initially listed that location as a possible alternative, it changed its mind as it was entitled to do. Randall's Island is remote from Harlem and more difficult to reach than Malcolm X Boulevard. Holding the event on Randall's Island would limit its reach to those who make an affirmative decision to travel to it whereas the Harlem location would involve no such limitation. Hence, a change to Randall's Island would adversely affect plaintiff's ability to reach its target audience.

Plaintiff's desired venue is relevant to the ample alternatives analysis for an additional reason. Harlem enjoys a unique place in the African–American experience. Holding the event in that location will infuse substantial and unique additional meaning to the message of the event. While this alone is not controlling here, its relevance to the analysis was recognized expressly by the Supreme Court in *City of Ladue*[99] and by the district court in the highly-analogous *Nationalist Movement* decision.[100] The special significance of Harlem thus undermines the adequacy of the City's alternative locations.

**89.** 743 F.Supp. 1055.

**90.** *Id.* at 1066.

**91.** 1998 WL 388892.

**92.** *Id.* at 192–93 (citing *City of Ladue*, 512 U.S. at 56, 114 S.Ct. 2038).

**93.** 914 F.2d 1224.

**94.** *Id.* at 1229.

**95.** 660 F.Supp. 333 (W.D.Va.1987), *aff'd*, 838 F.2d 735 (4th Cir.1988).

**96.** *Id.* at 339–40. *See also Christian Knights of the KKK v. District of Columbia*, 751 F.Supp. 218, 223 (D.D.C.1990); *Dr. Martin Luther King, Jr. Movement, Inc. v. City of Chicago*, 419 F.Supp. 667, 674 (N.D.Ill.1976) (plaintiffs desired to march through white neighborhood to convey message; denied ample alternatives where Chicago re-routed march to black neighborhood).

**97.** Cpt. ¶ 26.

**98.** Indeed, defendants assert in their papers that the event cannot be held in Harlem or *any* Manhattan neighborhood. Def. Mem. at 14.

**99.** 512 U.S. at 56, 114 S.Ct. 2038 (noting that placing a sign in one's residence conveys a meaning at times unique from the same sign place elsewhere).

**100.** at 192–93 ("location may be an essential part of the message sought to be conveyed"); *cf. Women Strike*, 472 F.2d at 1287 (recognizing "unmistakable symbolic significance" of demonstrating in proximity to the seat of government).

*Conclusion*

Accordingly, plaintiff's motion for a preliminary injunction is granted to the extent set forth in the preliminary injunction previously entered.

The foregoing constitute the Court's findings of fact and conclusions of law.

SO ORDERED.

## PRELIMINARY INJUNCTION

Plaintiff having moved for a preliminary injunction, and the Court having conducted an evidentiary hearing, considered the submissions of the parties, rendered findings of fact and conclusions of law in open court, and reserved the right to supplement its findings and conclusions in a written opinion to be filed subsequently, it is hereby

ORDERED, that plaintiff's motion is granted only to the extent that defendants are enjoined and restrained, pending the hearing and determination of this matter, from relying on the absence of a permit from the City of New York to interfere with plaintiff's proposed event on Malcolm X Boulevard on September 5, 1998, *provided, however,* that nothing herein shall limit any other lawful exercise of defendants' authority including, but not limited to, maintaining access for emergency vehicles, keeping intersections open to the extent necessary to permit appropriate movement of east-west traffic and crowd expansion space, and permitting access to and egress from police and fire stations and Harlem Hospital.

SO ORDERED.