METROPOLITAN COUNCIL,
INC., Plaintiff,

v.

Howard SAFIR, Commissioner of the New York City Police Department; Henry Stern, Commissioner of the New York City Parks Department; and the City of New York, Defendants.

No. 00 Civ. 4254(KMW).

United States District Court,
S.D. New York.

June 12, 2000.

Christopher T. Dunn, Norman Siegel, Arthur Eisenberg, New York Civil Liberties Union Foundation, New York, NY, for Metro. Council, Inc.

## OPINION & ORDER

KIMBA M. WOOD, District Judge.

Plaintiff Metropolitan Council, Inc. is a tenants' advocacy organization that opposes rent increases proposed by the Rent Guidelines Board (the "Board"), the New York City (the "City") agency that sets the maximum annual rent increases for New York's rent-regulated apartments. Plaintiff plans to protest the proposal, and to pressure the City's Mayor to take steps to stop it, by conducting a series of events on Tuesday and Wednesday, June 13–14, 2000, shortly before the proposal is examined at a hearing scheduled for Thursday, June 15. Part of the planned protest involves a vigil near the Mayor's residence, Gracie Mansion, in which participants will lie and sleep on a City sidewalk in order to convey symbolically the homelessness plaintiff contends will be caused if the proposed rent increases are adopted. On June 8, 2000, plaintiff moved for preliminary injunctive relief enjoining the City from preventing vigil participants from lying or sleeping on the City sidewalk, interference plaintiff anticipates because of the City's policy of preventing any person from sleeping on City sidewalks under any circumstances, as well as its past application of this policy to persons lying and sleeping on City sidewalks as part of a political protest.

The City has taken the position that a total ban on sleeping on City sidewalks is justified by its interests in safeguarding sleeping persons from the dangers of public places and in keeping the sidewalks clear of obstructions. The City argues that this ban should apply to the instant vigil, notwithstanding its concession that these sleeping vigil participants will neither be endangered nor obstruct the sidewalk. For the reasons stated more fully below, the Court concludes that under these circumstances, the First Amendment of the United States Constitution does not allow the City to prevent an orderly political protest from using public sleeping as a means of symbolic expression. Although the City maintains that such a conclusion implies that it cannot ever regulate disorderly public sleeping, the Court disagrees in light of the obvious and dramatic differences between the forms of conduct in question. In granting plaintiff's motion for a preliminary injunction, the Court expresses no opinion on and erects no bar to the City's prosecution for disorderly conduct of persons who are vulnerable and/or risk creating obstructions when they sleep prone on a City sidewalk.

### I. Background

The facts relevant to this dispute are simple and undisputed. They have been established by affidavits submitted by the parties, all of which were received in evidence at a hearing held on Friday, June 9, 2000; there were no objections, and no party sought to cross-examine the affiants, who were available in the courtroom. The parties also stipulated to a number of facts on the record. (*See generally* Transcript of June 9, 2000 Hearing Before Hon. Kimba M. Wood in *Metropolitan Council, Inc. v. Safir*, 00 Civ. 4254(KMW) ("Tr.")).

Plaintiff seeks to hold a three-part protest in the evening of June 13 and the morning of June 14. First, the event will begin with a press conference between 6 p.m. and 8 p.m. in Carl Schurz Park (the "Park"), which abuts Gracie Mansion. Second, at 8 p.m. participants will begin a five-hour vigil in the Park (the "Park phase"), which will involve persons lying on the ground in order to convey symboli-

cally the additional homelessness that plaintiff alleges will result from the rent increases proposed by the Board. There is no dispute as to these two parts of the protest (the press conference and the Park phase of the vigil), both of which will be allowed pursuant to permits issued by the Parks Department.[1]

The conflict arises from the third phase of the protest, when plaintiff plans for no more than twenty five vigil participants to relocate from the Park (which closes at 1 a.m.) to part of a stretch of sidewalk on the west side of East End Avenue, opposite the Park and Gracie Mansion, and an adjacent portion of the sidewalk along 88th Street (the "sidewalk phase"). Specifically, the protesters will continue lying prone from 1 a.m. to 8 a.m. on the sidewalks adjoining the west side of East End Avenue north of its intersection with 88th Street, and the north side of 88th Street near the intersection. Plaintiff expects and intends that for some amount of this period a substantial number of participants will sleep. (*See* Tr. at 10.)

The vigil participants will lie side by side, perpendicular to the apartment building on this block, covering no more than half of each sidewalk's width. The sidewalk along East End Avenue is sixteen feet wide; the sidewalk along 88th Street is fifteen feet wide. The protesters have agreed to occupy only 7.5 feet of each sidewalk's width. The protesters will thus leave clear for pedestrian use about half the width of each sidewalk (8.5 feet of width along the East End Avenue side, and 7.5 feet of width along the 88th Street side). The length of the area to be covered by the bodies will not exceed 75 feet (three feet per person). Plaintiff will not block either of the entrances to the apartment building, entrances that are located approximately 60 feet north of the intersection and 170 feet to its west. Plaintiff will regulate the conduct of vigil participants by providing event marshals who will ensure that participants stay within the designated space, coordinate their activities, and respond to any emergencies. During the vigil, its purpose will be communicated by signs and printed literature.

The sidewalks in question are City sidewalks outside the jurisdiction of the Parks Department. The City concedes that no permit is required for a group to gather and demonstrate on a City sidewalk, so long as amplified sound is not used and the demonstration does not involve a parade or procession.[2] *See* N.Y.C. Admin. Code §§ 10–108, 10–110.

The City Police Department has an absolute policy of preventing persons from lying and sleeping on public sidewalks. According to defendants' affiant, the police intervene "whenever a member of the force observes an individual sleeping on the sidewalk or other public thoroughfare" regardless of the reason the person is there;[3] the police then give the person a

---

1. At the outset of this litigation, plaintiff believed that vigil participants would not be permitted to lie in the Park and sought preliminary injunctive relief that would have barred any interference with the Park phase of the vigil. The parties have subsequently reached an agreement as to the Park phase, and plaintiff has withdrawn its request for an injunction with respect to it. (*See* Tr. at 3.)

2. Counsel for defendants has raised the possibility, but is not currently contending, that the sidewalks in question could be subject to a licensing arrangement between the City and the adjoining apartment building that differs from what is ordinarily considered a public City sidewalk. (Tr. at 28–29.) In the absence of either evidence or a representation from defendants that such an arrangement is actually present here, the Court disregards this possibility. In any event, it is by no means clear that it is significant whether the sidewalk's public character rests on City title, license, or some other arrangement. *See Denver Area Educ. Telecom. Consortium, Inc. v. Federal Commun. Comm'n*, 518 U.S. 727, 791–92, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (Kennedy, J., concurring in part and dissenting in part).

3. The City specifically notes that it makes no exception for expressive activity, and the sleeping ban has been invoked in the past to arrest persons attempting to sleep on City sidewalks as part of a political protest.

choice between relocation and arrest. (Affidavit of Inspector Stephen H. Friedland ("Friedland Aff.") at ¶¶ 9–10.) The City thus imposes a "general ban on sleeping on the City sidewalks." The City enforces this ban without exception and without any consideration of a sleeping person's intent or the actual effects of his or her conduct in the particular case. (Friedland Aff. ¶¶ 8–9; Tr. at 8.)

The sole asserted legal basis for the City's authority to impose such a ban is section 240.20[5] of the New York State Penal Code, which reads:

> A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:
>
> . . .
>
> 5. He obstructs vehicular or pedestrian traffic;
>
> . . . .

The City asserts that a blanket ban on public sleeping furthers the purposes of the statute because (1) individuals sleeping on sidewalks necessarily endanger themselves because of their vulnerability to crime or accidents (from, for example, cars jumping curbs and falling objects), and (2) individuals sleeping on the sidewalk "inherently hamper free movement on and accessibility of the sidewalk." (Friedland Aff. ¶¶ 4–6.)

The City concedes that, notwithstanding its concerns about public sleeping in general, the conduct involved in this protest poses no particular danger to vigil participants and no risk of obstructing the sidewalk. (Tr. at 18–19, 29–33.) The City does not dispute plaintiff's position that the general dangers cited in the Friedland Affidavit will not be implicated by this vigil because it will be overseen by protest marshals, and will occupy a limited portion of sidewalk in a relatively quiet part of the City during an especially quiet period of the day.[4] The City candidly acknowledges that regardless of whether vigil partici-

pants sit, stand, or sleep on the ground, it will have a police presence that will protect them and prevent any undue blockage of pedestrian passage. Based on both counsel's stipulations and the evidence before it, the Court finds that, as planned, the vigil will not obstruct pedestrian traffic and will not subject its participants to a heightened danger of attack or accident.

## II. *Discussion*

### A. *Laches*

Defendants have urged the Court to deny plaintiff's motion for a preliminary injunction without reaching its merits because of plaintiff's allegedly unreasonable delay in seeking relief from the Court. The Court declines to do so.

As a preliminary matter, the question of plaintiff's delay is appropriately addressed under the rubric of laches, not the irreparable harm prong of the preliminary injunction standard. Plaintiff alleges future, though imminent, deprivation of its constitutional rights. Accordingly, delay in seeking the injunction does not undermine plaintiff's contention that such a deprivation would be irreparable, unlike a situation where a plaintiff sits idly by while irreparable harm is allegedly being suffered on an ongoing basis. *See Million Youth March, Inc. v. Safir*, 18 F.Supp.2d 334, 339–40 (S.D.N.Y.1998) (contrasting irreparable harm from future denial of First Amendment rights with irreparable harm from ongoing infringement of intellectual property rights), *modified on other grounds*, 155 F.3d 124 (2d Cir.1998).

Laches is an equitable doctrine applied to deny relief in the court's discretion when "it is clear that a plaintiff unreasonably delayed in initiating an action and a defendant was prejudiced by the delay." *Robins Island Preserv. Fund, Inc. v. Southold Dev. Corp.*, 959 F.2d 409, 423 (2d Cir.1992); *accord Million Youth March*, 18 F.Supp.2d at 340. Here, the proposed rent increase was announced on May 8,

---

4. Plaintiff anticipates that few, if any, vigil     participants will sleep past 6 a.m.

and was slated for debate at a previously scheduled June 15 hearing. On May 15, one of plaintiff's committees met to discuss the rent proposal, and it decided to raise the idea of a vigil with the Executive Committee, which met on May 24. The Executive Committee did not select a vigil site at that meeting, and waited until a June 1 meeting to choose the site near Gracie Mansion. Plaintiff initiated discussions with the City the next morning.[5]

Under the circumstances, plaintiff moved with reasonable speed in its planning of the vigil. Although plaintiff did not move with maximum feasible speed, the Court sees no basis for imposing such a requirement here, notwithstanding the fact that faster action would have assisted the Court and defendants. The limited time available to adjudicate this dispute stems primarily from the speed with which the political situation has evolved, and the Court is disinclined to cut off plaintiff's access to judicial remedies when citizens' ability to protest and influence government action is at stake. Cf. Million Youth March, 18 F.Supp.2d at 340 (rejecting laches argument even though plaintiff waited ten weeks to file suit after the City's rejection of its proposed event location).

The Court acknowledges that defendants have been forced to present their arguments on a very compressed schedule, but prejudice to defendants alone, without fault on plaintiff's part, is insufficient to support laches. Moreover, the prejudice to defendants is lessened by the absence of factual disputes among the parties. Finally, the City's authority to arrest persons for sleeping on public sidewalks, and its avowed policy of doing so, has long been a matter of public controversy, putting the City on notice of the advisability of preparing for a legal challenge to that policy. See, e.g., Somini Sengupta, Ten Arrested At Rally Against Crackdown On Homeless, N.Y. Times, Dec. 7, 1999, at B1.

For these reasons, denial of plaintiff's motion on laches grounds is inappropriate.

## B. *Preliminary Injunction Standard*

■ Plaintiff seeks a preliminary injunction preventing the City from interfering with its plan to engage in what it considers expressive activity by lying and sleeping on a City sidewalk. Plaintiff does not seek issuance of a permit, nor does it seek a declaration that a statutory or regulatory scheme is unconstitutional. Under these circumstances, the Court construes plaintiff's application as one for a prohibitory injunction that would "stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme." See Latino Officers Ass'n v. City of New York, 196 F.3d 458, 462 (2d Cir.1999) (citation omitted). Accordingly, a preliminary injunction may issue only if plaintiff "show[s] irreparable harm in the absence of an injunction and a likelihood of success on the merits." Id. (citation omitted); accord Beal v. Stern, 184 F.3d 117, 122 (2d Cir.1999). The issuance and scope of any injunction is committed to the Court's sound discretion, taking into account "all the equities of the situation, including the public interest." Million Youth March, 155 F.3d at 125.

■ The more demanding standard of a showing of "a 'clear' or 'substantial' likelihood of success" is inappropriate here. Such a heightened standard is appropriate when the injunction is mandatory rather than prohibitory in nature, a distinction that the Second Circuit has recognized is

---

**5.** Defendants suggest that they were initially misled that the sidewalk phase of the vigil would occur on the east side of East End Avenue, which is within the Parks Department's jurisdiction and thus requires a permit for a demonstration of this size, not the west side of East End Avenue, which is a City sidewalk. Plaintiff's counsel disagrees. The Court notes that plaintiff's letter of June 2, 2000, clearly refers to use of "City sidewalks," distinguishes between the park phase (which it notes would be subject to Parks Department rules) and the sidewalk phase, and refers to "an appropriate sidewalk area" without suggesting any limitation to the avenue's east side.

difficult to draw with precision, *see Tom Doherty Assocs. v. Saban Entertainment, Inc.,* 60 F.3d 27, 34 (2d Cir.1995), but which generally entails injunctions that "will alter, rather than maintain the status quo, or will provide the movant with relief that cannot be undone even if the defendant prevails at a trial on the merits." *Beal,* 184 F.3d at 122 (internal quotation marks and modifications omitted). The Court notes that a plausible argument can be made that this injunction would provide plaintiff with relief that cannot be undone, one ground relied upon in *Beal* to classify as mandatory a preliminary injunction enjoining enforcement of a park permit scheme. *See also Million Youth March,* 18 F.Supp.2d at 339 (classifying as mandatory a preliminary injunction requiring issuance of an event permit because "it would provide plaintiff with substantially all the relief that it seeks" and because it would "mandate" issuance of a permit). Here, however, plaintiff seeks less sweeping relief than in *Beal:* an injunction tailored to a single event, not an injunction against general enforcement of a detailed regulatory scheme.

Moreover, nothing in the proposed injunction would bar the City from a future criminal prosecution of the vigil participants. In the context of an exercise of First Amendment rights, it is "deeply etched in our law [that] a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). Accordingly, an injunction, although not permitting the vigil to be undone, would leave open the preferred form of relief against violations of laws limiting speech. To hold otherwise would essentially apply the "mandatory" label to every preliminary injunction designed to allow a particular expressive event to occur without interference, even when no permit is required by law. *Cf. Latino Officers Ass'n v. City of New York,* No. 97 Civ. 1384(KMW), 1999 WL 386753,*3 (S.D.N.Y. June 10, 1999) (applying standard for prohibitory injunctions), *aff'd,* 196 F.3d 458, 462 (same); *Housing Works, Inc. v. Safir,* No. 98 Civ. 4994(HB), 1998 WL 409701, *2 (S.D.N.Y. July 21, 1998) (same); *United Yellow Cab Drivers Ass'n, Inc. v. Safir,* No. 98 Civ. 3670(RPP), 1998 WL 274295, *2 (S.D.N.Y. May 27, 1998) (same); *but cf. Tunick v. Safir,* 209 F.3d 67, 70 (2d Cir.2000) (opinion of Calabresi, J.) (merging, without discussion, the standards for injunctions staying government action and mandatory injunctions); *Million Youth March,* 18 F.Supp.2d at 339 (Kaplan, J.) (applying standard for mandatory injunctions); *Irish Lesbian and Gay Org. v. Giuliani,* 918 F.Supp. 732, 739–40 (S.D.N.Y.1996) (Koeltl, J.) (same).[6]

Accordingly, the Court requires the same showing as in *Latino Officers:* irreparable harm in the absence of an injunction and a likelihood of success on the merits.[7] In a First Amendment case such as this one, the issue of irreparable harm merges with the question of success on the merits. *See Latino Officers,* 196 F.3d at 462; *Beal,* 184 F.3d at 123–24.

C. *The Merits of Plaintiff's First Amendment Claim*

■ This case turns on the balance between plaintiff's interest in engaging in expressive activity that is intertwined with the specific conduct of lying and sleeping on a City sidewalk and the City's interest

---

**6.** When the party seeking a preliminary injunction has unreasonably delayed in initiating litigation, the Court may in its discretion elect to require a stronger showing on the merits rather than denying relief altogether. *See Irish Lesbian and Gay Org. v. New York State Bd. of Ancient Order of Hibernians,* 788 F.Supp. 172, 175–76 (S.D.N.Y.1992) (Leval, J.). The Court declines to do so here for the reasons stated above in the discussion of laches.

**7.** In any event, the Court concludes that plaintiff is clearly likely to succeed on the merits, so the result does not turn on the mandatory/prohibitory distinction.

in preventing persons from lying and sleeping on City sidewalks. The parties agree that the City's policy is content-neutral. Moreover, the parties agree that the proposed activity of lying and sleeping on the City sidewalks has an expressive component in the context of this vigil and its preceding press conference. The Court emphasizes that this case does not involve, nor does the Court express any opinion concerning, the broader question of whether the City may prohibit lying and sleeping on public sidewalks when that conduct is not an integral part of a large, planned, publicized protest and is not accompanied by incidents of speech such as signs and literature explaining the protest. *See Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 294, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (holding that symbolic expression through conduct is protected by the First Amendment when "in context, [it] would reasonably be understood by the viewer to be communicative").

The City's application to this vigil of its policy concerning sleeping on public sidewalks is constitutionally permissible only if that policy:

1) advances a "significant governmental interest,"

2) is "narrowly tailored" to serve that interest, and

3) "leave[s] open ample alternative channels for communication."

*Clark*, 468 U.S. at 293, 104 S.Ct. 3065; *accord Bery v. City of New York*, 97 F.3d 689, 697 (2d Cir.1996).

The City's policy has features of both a content-neutral time, place, and manner restriction on speech in a traditional public forum, of which the City sidewalks are undoubtedly a prime example, *see Loper v. New York City Police Dep't*, 999 F.2d 699, 704 (2d Cir.1993), and a content-neutral regulation of conduct that incidentally burdens speech, *see Turner Broad. Sys., Inc.*

*v. Federal Commun. Comm'n*, 512 U.S. 622, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (discussing the test derived from *O'Brien v. United States*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)). There "is little, if any, differen[ce]" between the standards applied to these two types of restriction on expressive activity. *Ward*, 491 U.S. at 798, 109 S.Ct. 2746 (quoting *Clark*, 468 U.S. at 298, 104 S.Ct. 3065). The Supreme Court has equated their requirements for narrowly-tailored advancement of a significant governmental interest. *See Turner Broadcasting*, 512 U.S. at 662, 114 S.Ct. 2445.

The "ample alternative channels" requirement has not explicitly been incorporated into the *O'Brien* test for conduct regulation that burdens speech, *see id.* (not discussing availability of alternative channels), but even if that requirement does not apply to conduct regulation burdening speech outside a public forum, it clearly does apply to such regulation in a public forum. In *Bery*, for instance, the Second Circuit considered the unavailability of "ample alternative channels" to art sellers in the context of a City ordinance requiring a license for those selling anything other than food in public places.[8] There, as here, the regulation in question restricted conduct (vending of non-food items) that included non-expressive conduct (for instance, selling umbrellas) but which also burdened expressive activity (selling art) in a public forum. Accordingly, this case is properly analyzed under the same standard applied in *Bery*, the standard for time, place, and manner restrictions on speech in a traditional public forum. *See* 97 F.3d at 697.

### 1. The City's Interest in Regulating Sleeping on Public Sidewalks

The City puts forward two general interests that it asserts are advanced by its ban on sleeping on public sidewalks: (1) pro-

---

**8.** Moreover, the *Bery* court applied the full time, place, and manner test after noting that the district court had applied the *O'Brien* test without "address[ing] the question of whether alternative channels of expression remained open to appellants." 97 F.3d at 693.

tecting sleeping individuals from the dangers of the streets, dangers to which people are far more vulnerable when asleep than when awake, and (2) preventing sleeping individuals from obstructing free passage for pedestrians, something that, according to the City, sleeping persons "inherently" do.[9] (*See* Friedland Aff. ¶¶ 3–7.) The Court has no doubt, and plaintiff does not dispute, that the City has a substantial interest both in protecting vulnerable persons from the dangers posed by criminals and errant cars and in maintaining the free movement of pedestrian traffic on City sidewalks. *See, e.g., Cox v. Louisiana,* 379 U.S. 536, 554–55, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). Moreover, the City's policy clearly furthers these interests to some extent. In order to justify application of this policy to expressive conduct, however, the complete ban on sleeping or lying on public sidewalks must be narrowly tailored to advance those interests.

### 2. *Narrow Tailoring*

The narrow tailoring requirement does not obligate the City to use the "least restrictive or least intrusive means" to advance its interests, but it does bar the City from "burden[ing] substantially more speech than is necessary to further" those interests. *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *accord Turner Broadcasting,* 512 U.S. at 662, 114 S.Ct. 2445. As the facts of this case demonstrate, a complete ban on sleeping or lying on public sidewalks is not narrowly tailored either to protecting citizens from the dangers of City streets or to preventing sidewalk obstruction.

The City's complete ban—encompassing public sleeping in any manner on all sidewalks at all times by all people as part of any activity—is overbroad. The City acknowledged at oral argument that applying its ban on public sleeping to this vigil fails to further its asserted interests. The vigil is planned to occupy a limited amount of space—no more than half the width of the sidewalk—and to avoid obstructing any entrances to adjacent buildings. The City concedes that standing protesters occupying exactly the same amount of space on the sidewalk would not obstruct pedestrian traffic, and that it would not attempt to interfere with such a protest. Moreover, plaintiff plans to staff the vigil with marshals (some of whom would be awake at all times) to ensure that participants, whether awake or asleep, do not spill out of the protest area and block the sidewalk; the City does not dispute the effectiveness of this arrangement. With respect to danger to the participants, the City concedes that the presence of marshals eliminates those safety concerns related to sleeping. Finally, the City acknowledges that because this is a planned, publicized protest, it intends to maintain a significant police presence at the event regardless of its form, and that this police presence can and will protect participants from harm and prevent them from occupying excessive sidewalk space, just as the City would with a group of standing or sitting protesters. Indeed, the City itself characterized as "ridiculous" the notion that its general concerns about public sleeping could have any application to sleeping participants in this vigil.

The inapplicability to this event of the City's general concerns does not necessarily imply that the complete sleeping ban is overbroad. Some harmless conduct may be barred by a restriction that is "narrowly tailored," given that the City need not employ the least restrictive means to address its concerns about public sleeping.[10]

---

**9.** The City justifies its ban on sleeping *or* lying on City sidewalks by reference to the dangers posed by sleeping individuals. The City extends the ban, however, to persons who are lying on the sidewalk but awake, because the City claims it would impose an undue burden on police officers to determine who is awake and who is asleep.

**10.** Similarly, "narrow tailoring" is not assured by the mere fact that the ban's application to some other conduct, or even a substan-

Here, however, the sleeping ban is over-broad because of the obvious and dramatic difference between the conduct at which the ban is aimed—as defendants' counsel put it, "the normal circumstances ... [involving] just intoxicated individuals that sleep on the sidewalk or homeless persons who sleep on the sidewalk" (Tr. at 19–20)—and the organized, constrained protest attended by the media and guarded by protest marshals and the police that is at issue here. These features that render the sleeping here innocuous, defendants acknowledge, are not idiosyncratic to this vigil but are general features of organized political protest in this city. Because the suppression of any such protest to the extent it involves the symbolic use of sleeping or lying on the ground is utterly unnecessary to further the interests that underlie the sleeping ban, the Court concludes that the ban is not narrowly tailored to the asserted interests.

### 3. The City's Objection That Allowing The Vigil Undermines Its General No–Sleeping Policy

The City contends vigorously that to prevent it from banning sleeping at this vigil is to permit conduct that runs afoul of a generally valid ban merely because it has an expressive character in the particular case. The Court disagrees. This is a not a case in which a speaker seeks an exemption from a narrowly-tailored regulation simply because he intends to violate it for purposes of speech. Cf. Cox, 379 U.S. at 554, 85 S.Ct. 453 ("One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest."). Instead, it is a case in which a subset of conduct falls within the parameters of the ban and yet fails to implicate the interests allegedly supporting the ban; particularly troubling is that

the conduct (public sleeping) is especially likely to fall into this subset (unproblematic public sleeping) when it has a primarily expressive function (such as in this protest).

It is this feature that distinguishes this case from Clark v. Community for Creative Non–Violence. In Clark, the Supreme Court held that the government was not required to exempt a political protest from a general ban on camping in federal parks, where "camping" included sleeping. The government had issued a permit that allowed protesters against homelessness to erect a tent city in Lafayette Park and the Mall in Washington, D.C., so long as demonstrators did not sleep in the tents. See 468 U.S. at 290–92, 104 S.Ct. 3065. In that case, however, the Court emphasized that the ban on camping needed to apply to demonstrators because "[d]amage to the parks as well as their partial inaccessibility to other members of the public can as easily result from camping by demonstrators as by nondemonstrators." 468 U.S. at 298, 104 S.Ct. 3065. Because application of the ban to demonstrators generally furthered its purposes, it was not significant that in the case of the particular protest there may have been little incremental benefit to the government from banning sleep but otherwise permitting erection of a tent city.[11] See id. at 297–98, 104 S.Ct. 3065; see also Paulsen v. Gotbaum, 982 F.2d 825, 829 (2d Cir.1992) (noting that application to a small event of a ban on leafletting and solicitation was justified "[i]f the rule is narrowly tailored for the events taken as a whole," including far larger ones). Accordingly, the ban was not overbroad, notwithstanding that it restricted the protesters' attempt to communicate their message by sleeping in public.[12]

---

tial amount of conduct, does further the City's general interests.

**11.** The Court also found it significant that "the Park Service neither attempts to ban sleeping generally nor to ban it everywhere in the parks." 468 U.S. at 295, 104 S.Ct. 3065.

**12.** Unlike the situation here, the "major value" of sleeping to the demonstration in Clark was that it facilitated a continuous presence in the parks and the attraction of homeless people to the tent city, 468 U.S. at 296, 104 S.Ct. 3065; here, sleeping plays a more sig-

Here, unlike in *Clark*, demonstrations involving lying down and sleeping on a sidewalk are unlikely to pose the risks that the ban seeks to avoid, in light of the precautions routinely taken by protest organizers and the police regardless of whether an event involves sleeping. The same factors that in combination will make it obvious to any passer-by or television viewer that vigil participants are engaged in symbolic expression of a political message concerning sleeping in the streets also render irrelevant the City's concerns about disorderly obstruction of sidewalks and vulnerability to crime and accident: the pre-vigil publicity, the signs and literature present at the vigil, the presence of media and the police, the proximity to Gracie Mansion, the presence of awake and alert protest marshals.

This analysis receives further support from the Second Circuit's opinion in *Bery v. City of New York*, in which the court enjoined the City from enforcing against artists its general requirement that vendors receive a City license before selling their wares in public places. The *Bery* court analyzed the licensing requirement "as it relates to appellants" and treated it as a "prohibitive interdiction barring the display and sale of visual art on the City streets," even though the impact on visual artists was only incidental to a licensing scheme applicable to vending without regard to whether expression was implicated. 97 F.3d at 697. Accordingly, although the validity of the City's sleeping ban "need not be judged solely by reference to the demonstration at hand," *Clark*, 468 U.S. at 296–97, 104 S.Ct. 3065, it is appropriate to consider its impact on a particular class of expressive activity.

Finally, the Court notes that it sees no danger that an injunction concerning this vigil will lead to the parade of horribles envisioned by the City. The City contends that if it cannot stop sleeping at this vigil, then it cannot "under any circumstances, regulate the use of city sidewalks in a manner it deems necessary and appropriate to promote the free flow of pedestrian traffic, the safety of individuals who may engage in that conduct [sleeping], and the safety of others who live in that location or who would go by that location." (Tr. at 14.) The latter question is not before the Court and no answer to it is entailed by this decision. *Cf. Whiting v. Town of Westerly*, 942 F.2d 18, 21 (1st Cir.1991) (upholding general ban on public sleeping but noting that "plaintiffs do not claim that their sleeping constituted expressive conduct implicating their rights under the first amendment").

First and foremost, it must be emphasized that all the Court is doing is allowing plaintiff to exercise First Amendment freedoms in the context of this vigil. The City has offered no evidence that those who sleep on the sidewalks while intoxicated and/or homeless (the instances cited by the City) will implicate the First Amendment at all. Although counsel for the City has expressed concern that any intoxicated person sleeping on the street can claim that his conduct is symbolically expressive, conduct is not converted into symbolic expression by intentions alone; instead, conduct must also "reasonably be understood by the viewer to be communicative." *Clark*, 468 U.S. at 294, 104 S.Ct. 3065; *cf. Loper*, 999 F.2d at 704 (analyzing whether begging constitutes expressive activity and concluding that it does); *Young v. New York City Transit Auth.*, 903 F.2d 146, 152–54 (2d Cir.1990) (analyzing whether begging possesses any expressive character and implying that it does not). Declaring that one's conduct is expressive does not make it so, and thus the City's fear that persons actually engaging disorderly conduct will "be able to assert ... that really what they are doing is exercising

nificant expressive role relative to other aspects of the protest and is not primarily facili-

tative.

their rights afforded them under the First Amendment," (Tr. at 35), is misplaced.

Second, even when public sleeping is expressive, it is subject to reasonable time, place, and manner restrictions. A complete ban on all sleeping is not such a reasonable restriction, but more narrowly tailored restrictions are surely possible. *Cf. Bery*, 97 F.3d at 697 (noting that "both visual and written expression may ... be ... restricted by regulations addressed to particular areas of the City where public congestion might create physical hazards and public chaos"); *Loper*, 999 F.2d at 706 (2d Cir.1993) (enjoining enforcement of City ordinance banning begging in public places but distinguishing bans on "aggressive begging"). Nothing in the Court's decision here suggests that the City must permit public sleeping under all circumstances, or that the City must permit all public sleeping that has any expressive character.

### 4. *Alternative Avenues for Communication*

Because plaintiff is clearly likely to succeed on overbreadth grounds, the Court need not analyze whether sufficient alternative means of communication would be available to plaintiff were it barred from including sleeping in the sidewalk phase of the vigil.

### D. *The Injunction Is Limited to Preventing a Prior Restraint on Speech*

It is important to note that plaintiff seeks, and the Court grants, a preliminary injunction limited to enjoining the City from preventing plaintiff from engaging in the symbolic activity of sleeping as part of the planned vigil.[13] The Court is not prohibiting the City from taking post-vigil steps to criminally prosecute participants for any alleged violations of section 240.20[5] of the New York Penal Code, the sole asserted statutory basis for the City's

public sleeping ban. What the Court enjoins is only arrests of prone vigil participants that cut off their protest. If the City believes that sleeping participants in the vigil who adhere to the protest constraints have nonetheless "obstruct[ed] vehicular or pedestrian traffic" "with intent to cause public inconvenience, annoyance or alarm, or [have] recklessly creat[ed] a risk" of the same, it is free to pursue that theory in the criminal justice system after the vigil.

This limited relief enjoins only the most pressing, and most constitutionally problematic, aspect of the City's policy: its function as a prior restraint on speech. Arrests, or orders to disperse, that immediately follow attempts by vigil participants to lie and sleep would essentially prevent the planned expressive conduct of an overnight vigil. *See generally Tunick v. Safir*, 209 F.3d 67, 92–94 (2d Cir.2000) (Sack, J., concurring in the judgment) (discussing prior restraint issue with regard to potential arrest of photographer and models at outset of a photo shoot); *see also Carlin Commun., Inc. v. Mountain States Telephone and Telegraph Co.*, 827 F.2d 1291, 1296 (9th Cir.1987) (analyzing as a prior restraint termination of a telephone service after the service had repeatedly transmitted allegedly obscene messages); *Penthouse Int'l, Ltd. v. McAuliffe*, 610 F.2d 1353, 1357–59 (5th Cir.1980) (analyzing as a prior restraint warrantless arrests of magazine retailers after they had displayed allegedly obscene materials for sale); *Admiral Theatre v. City of Chicago*, 832 F.Supp. 1195, 1203–04 (N.D.Ill.1993) (analyzing as a prior restraint arrests of nude dancers after they had begun allegedly obscene dancing). "The essence of prior restraints are that 'they g[i]ve public officials the power to deny use of a forum in advance of actual expression.'" *Beal*, 184 F.3d at 124 (quoting *Southeastern Promotions, Ltd. v.*

---

**13.** The Complaint requests that the Court "enjoin[] the defendants from taking any steps that would *prevent* the plaintiff from

engaging in the symbolic expressive activity of lying or sleeping on the public sidewalk" (emphasis added) during the planned vigil.

*Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975)) (modification in *Beal* opinion). Such advance interference with expression may constitute a prior restraint even when it is content-neutral. *See id.* (citing *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992)). "[P]rior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights." *Id.* (quoting *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976)).

Here, as in *Tunick,* the City has (1) foregone use of a licensing system to regulate demonstrations on public sidewalks, (2) "failed to adopt an ordinance that would make [s]eeping on public sidewalk[s] explicitly unlawful," and (3) nonetheless prohibited the conduct in question by invoking a general criminal statute that does not "clearly make" public sleeping *per se* unlawful. 209 F.3d at 92–93 (opinion of Sack, J.) (expressing doubt that a prior restraint imposed by the police "is any the more permissible" than one imposed through a licensing system); *see also Carlin Communications,* 827 F.2d at 1296 (holding that the government may either "prosecute vigorously ... [or] establish a prior-review permit system with procedures that satisfy the requirements laid down in *Freedman v. Maryland,* 380 U.S. 51, 58–59, 85 S.Ct. 734, 13 L.Ed.2d 649

(1965)" but that it may not "simply close down [the] communication forum"). The disorderly conduct statute that the City relies upon makes reference only to obstructing pedestrian traffic. Although the City has articulated a general relationship between sleeping and obstructing pedestrian traffic, it has admitted that obstruction of pedestrian traffic is not a necessary consequence of sleeping on a public sidewalk and that, in any particular case, it will arrest people for sleeping on a sidewalk even if they are not, in fact, obstructing it.[14] *But cf. People v. Pickett,* 21 Misc.2d 192, 193 N.Y.S.2d 953, 955 (Ct. of Spec. Sessions, Appellate Part, 1st Dep't 1959) ("Merely sleeping on a subway train does not, in and of itself, constitute disorderly conduct. ... To constitute 'disorderly conduct' there must be an actual or threatened breach of the peace.").[15] As for the City's concern about sleeping persons' vulnerability, the statute provides no apparent textual basis for treating as disorderly conduct any conduct that puts oneself at risk.

Finally, the statute contains a clear *mens rea* requirement, such that even if conduct actually does obstruct pedestrian traffic, the statute is violated only if that conduct is done. with intent, or reckless indifference to, "public inconvenience, annoyance, or alarm." Because the City concedes that, as planned, this vigil will not be disorderly and will not obstruct pedestrian

---

**14.** At oral argument, defendants' counsel suggested that some arrests in the past were based on disobedience of police orders to move to another location and/or refrain from sleeping. *See* N.Y. Penal Law § 240.20[6]. For present purposes, however, there is no significant difference between an arrest directly based on sleeping on a City sidewalk and an arrest based on disobeying an order not to sleep there. *See Wright v. State of Georgia,* 373 U.S. 284, 291–92, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963).

**15.** Defendants have suggested that their no-sleeping policy has already been implicitly approved by the New York State courts, but their authorities address only the propriety of prosecutions for particular incidents in which speech became disorderly. These authorities do not consider a general prophylactic rule

prohibiting conduct that has some tendency to become disorderly, nor do they suggest that application of the disorderly conduct statute to expressive conduct can never be unconstitutional. *See People v. Tichenor,* 89 N.Y.2d 769, 658 N.Y.S.2d 233, 680 N.E.2d 606 (1997) (upholding prohibition on use of abusive or obscene language against facial challenge and upholding conviction for disorderly conduct arising from defendant's instigation of a confrontation with a police officer through the use of obscene language); *People v. Turner,* 48 Misc.2d 611, 265 N.Y.S.2d 841 (1965) (upholding convictions for disorderly conduct arising from defendants' refusal to obey a police order to disperse when a "demonstration was interfering with pedestrian and vehicular traffic").

traffic, it is not obvious how vigil participants could have the requisite culpable mental state.

Here, where core First Amendment rights to political protest are at stake, where the City concedes that this vigil will not itself cause any public disorder, and where the City's authority to treat sleeping as *per se* disorderly conduct is far from clear, the equities weigh heavily in favor of permitting this vigil to go forward without restraint. Should the City wish to do so, it remains free to pursue its legal theory in a criminal proceeding after the protest. Both sides would then be able to test the theory's basis in state law, as well as its permissibility under the federal constitution, and any error on the City's part would not result in the unnecessary abridgement of free speech. *See Tunick,* 209 F.3d at 93–94 (opinion of Sack, J.) (comparing prior restraints to subsequent state court prosecutions). An arrest that stops the protest presents the opposite danger: that once the event has been stymied, the minor disorderly conduct charge is likely to be voluntarily dismissed, and defendants will be left restrained in their speech but unable to receive any vindication if such restraint was improper. Accordingly, the injunction plaintiff seeks appropriately reflects the First Amendment principle favoring post-hoc prosecution over prior restraint. *See Beal,* 184 F.3d at 124 (quoting *Southeastern Promotions,* 420 U.S. at 559, 95 S.Ct. 1239.)

### III. *Conclusion*

For the reasons stated above, the Court concludes that absent a preliminary injunction, plaintiff will suffer irreparable harm from City actions that are clearly likely to violate the First Amendment. Accordingly, the Court enters the following injunction.

This order concerns only plaintiff's planned vigil on the sidewalk abutting the northwestern corner of the intersection of East End Avenue and 88th Street between the hours of 1 a.m. and 8 a.m. on June 14, 2000. The Court orders defendants not to interfere with this vigil, nor with individuals' participation in it, on account of participants assuming a prone position and/or sleeping, so long as the participants abide by the conditions to which plaintiff has previously stipulated. Those conditions are that at all times during the vigil plaintiff will provide at least two marshals who will remain awake and alert and who will ensure that the vigil (1) will occupy no more than a 7.5 foot wide swath of sidewalk extending from the sidewalk's edge furthest from the street and extending in length no more than 75 feet, (2) will not obstruct or impede access to the building entrances on East End Avenue and 88th Street, and (3) will consist of no more than 25 persons.

Nothing in this order shall be construed to limit defendants' authority to regulate the conduct of persons sleeping in public under other circumstances, nor their authority to pursue criminal sanctions against vigil participants subsequent to the vigil based on any Penal Law violations the City alleges arise from their sleeping or lying on the sidewalk during the vigil.

SO ORDERED.