## UNITED FOR PEACE AND JUSTICE, Plaintiff,

v.

## THE CITY OF NEW YORK; Michael Bloomberg, Mayor of the City of New York; and Raymond Kelly, Commissioner of the New York City Police Department, Defendants.

### No. 03 CIV. 810(BSJ).

United States District Court, S.D. New York.

Feb. 10, 2003.

Christopher Dunn, Arthur Eisenberg, Donna Lieberman, New York Civil Liberties Union Foundation, New York City, for plaintiff.

Gail Donoghue, Rachel Goldman, New York City Law Department, New York City, for defendants.

### Opinion

JONES, District Judge.

Plaintiff, United for Peace and Justice, is a coalition of local and national organizations that oppose an American war against Iraq. Defendants are the City of New York; Michael Bloomberg, Mayor of the City of New York; and Raymond Kelly, Commissioner of the New York City Police Department (collectively the "City"). Plaintiff requests that this Court enjoin the City from denying it a permit for an event planned to take place on Saturday, February 15, 2003, only five days from this Court's decision. Plaintiff's permit application, filed on January 24, 2003, requested a permit for a march and rally, with a formation area at "Dag Hammarskjold Plaza with overflow as needed on 2nd Ave." (Goldman Aff., Ex. A). The parade route requested was from the Dag Hammarskjold Plaza (the "Plaza") south on First Avenue past the United Nations and the United States Mission, west on 42nd Street, north on Seventh Avenue to Central Park's Great Lawn. The application stated: "[m]archers to occupy width of roadway sufficient for 50,000—100,000 + people." (Id.). After some negotiation between the parties, on February 4, 2003 the

City informed Plaintiff that it would not permit any march to take place as part of the February 15 event. Instead, the City offered a stationary rally on Dag Hammarskjold Plaza, which is located at 47th Street between First and Second Avenues, with overflow on First Avenue from 49th Street north for as many blocks as required to accommodate the number of participants—estimated to reach as far north as 75th Street if 100,000 persons were to participate.

In its February 5, 2003 complaint, Plaintiff claims that a march past the United Nations is a necessary part of the event and that "[i]n refusing to permit a march to take place in conjunction with the plaintiff's anti-war event, the defendants are violating the plaintiff's rights under the First Amendment to the United States Constitution." (Comp. at ¶ 3). While Plaintiff has not specifically offered to forego its march past the United Nations, as late as the evening of February 7, after an evidentiary hearing, Plaintiff was willing to discuss alternate march routes. The City, however, was then and remains unequivocal in its position that it will not permit a march past the United Nations— or a march anywhere in Manhattan—in connection with the event, principally because of safety and security considerations. It also takes the position that the stationary rally it has offered Plaintiff provides a reasonable alternative channel of communication.

## I. THE LITIGATION

The complaint was filed February 5, 2003, briefs and affidavits were submitted on the morning of February 7 and an evidentiary hearing was held on the afternoon of February 7. The parties took discovery that included the depositions of

Leslie Cagan, the event organizer for Plaintiff, and Assistant Chief Michael Esposito, Commanding Officer of the Patrol Borough Manhattan South, between February 5 and February 7.[1] An additional letter submission from Plaintiff and a Statement of Interest, submitted pursuant to 28 U.S.C. § 517, from the United States Attorney for this district were received on February 8, 2003. Two further letter submissions, one each from Plaintiff and Defendants were submitted on February 9, 2003.

## II. BACKGROUND FACTS

United for Peace and Justice, established in October of 2002, "is a national campaign that brings together a broad range of organizations throughout the United States to help coordinate efforts to prevent a U.S. war in Iraq." (Cagan Aff. at ¶ 1). In response to the increased likelihood of war, "United for Peace and Justice ... planned a large anti-war march and rally for February 15, 2003, to coincide with similar events [scheduled] around the world for that same day." (Cagan Aff. at ¶ 3). The group intended the march to proceed directly in front of the United Nations, which includes the area bounded by 42nd Street on the south, 48th Street on the north, Franklin D. Roosevelt Drive on east, and First Avenue on the west. (Cagan Aff. at ¶ 3; Statement of Interest at p. 2). As Ms. Cagan explains, United for Peace and Justice places great significance in passing "within direct view of the United Nations." (Cagan Aff. at ¶ 1, 8). The United Nations is "responsible for monitoring activity in Iraq" and sponsors the "weapons inspections currently taking place in Iraq." (Cagan Aff. at ¶ 8). Just as Colin Powell took his message in favor of war with Iraq to the United Nations on

---

1. Patrol Borough Manhattan South ("Manhattan South") is the unit of the NYPD responsible for the entire area of Manhattan south of 59th Street.

February 5 and Hans Blix is scheduled to report to the United Nations Security Council on February 14, United for Peace and Justice seeks to use this march to bring its message of "mass opposition to the efforts of the United States" to the United Nations as well. (Cagan Aff. at ¶ 8).

### III. PRELIMINARY INJUNCTION STANDARD

■ In order for Plaintiff, the moving party in this case, to justify an award of a preliminary injunction, it must first demonstrate that it is likely to suffer irreparable harm in the absence of the requested relief. *Million Youth March, Inc. v. Safir,* 18 F.Supp.2d 334, 338–339 (S.D.N.Y.1998) ("*MYM I* "). "Once the likelihood of irreparable harm has been demonstrated, a movant ordinarily is entitled to relief if it demonstrates 'either (1) "a likelihood of success on the merits" or (2) "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly" in the movant's favor.' " *Id.* (quoting *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir. 1996)) (quoting *Waldman Publishing Corp. v. Landoll, Inc.,* 43 F.3d 775, 779–80 (2d Cir.1994)). If, though, a movant seeks to enjoin "governmental action taken in the public interest pursuant to a statutory or regulatory scheme," it may succeed only by demonstrating irreparable harm and a likelihood of success on the merits. *Housing Works v. Safir,* No. CIV.A. 98–4994, at *2, 1998 WL 409701 (S.D.N.Y. July 21, 1998) (internal citations omitted). Further, if

the injunction sought will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits, the showing of a likelihood of success must be "clear" or "substantial."

*MYM I,* 18 F.Supp.2d at 339 (internal citations omitted).

In this case, Plaintiff seeks a preliminary injunction "enjoining the defendants from preventing the plaintiff from conducting a peaceful march on First Avenue past the United Nations as part of its February 15, 2003, anti-war event, subject to reasonable restrictions." (Comp. at ¶ 28(3)). Plaintiff thus seeks to enjoin governmental action Defendant claims is being taken in the public interest pursuant to a regulatory scheme. Plaintiff must demonstrate, therefore, a likelihood of success on the merits in order to establish its rights to a preliminary injunction. Moreover, because of the requested date of the event, the grant of preliminary relief would provide Plaintiff with substantially all the relief that it seeks and that relief could not be undone by a trial on the merits. For this reason, to obtain a preliminary injunction Plaintiff must establish a clear or substantial likelihood of success on the merits and irreparable harm. *MYM I,* 18 F.Supp.2d at 339.

### IV. IRREPARABLE HARM

■ "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* Accordingly, Plaintiff's allegation that a preliminary injunction is necessary to prevent the imminent loss of its First Amendment right to march as part of its anti-war event, is sufficient to establish a likelihood of irreparable harm.

### V. PLAINTIFF'S LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff asserts that the City's permit policy for events such as this is unconstitu-

tional as applied to it.[2] The Constitutional framework is well settled. There is no dispute that marching in a public street in conjunction with political protest, "if peaceful and orderly, falls well within the sphere of conduct protected by the First Amendment." *Gregory v. City of Chicago*, 394 U.S. 111, 112, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969). The streets of New York City through which Plaintiff seeks to march

> have immemorially been held in trust for the use of the public and ... have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

*Hague v. Committee for Indus. Organization*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). This right to use public forums such as streets, however, is "not absolute" and "may be regulated in the interest of all ... in consonance with peace and good order." *Id.* at 516, 59 S.Ct. 954. Municipalities have the right "to regulate the use of city streets and other facilities to assure the safety and convenience of the people in their use...." *Cox v. Louisiana*, 379 U.S. 536, 554, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). To resolve the tension inherent in these competing interests, the Supreme Court has stated that

> the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for the communication of the information."

*Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)).

*A. The City's Ban on Plaintiff's Request to March in front of the United Nations*

■ Because the area surrounding the United Nations headquarters complex present heightened and somewhat different security concerns, the Court turns first to the City's denial of a permit to march past the United Nations. The Court notes initially that the United Nations Headquarters is uniquely sensitive among locations in New York City because of its function, our country's treaty obligations and its history as a terrorist target. Indeed, courts have recognized that there are clearly specific security concerns associated with demonstrations on the City's streets and sidewalks in the vicinity of sensitive areas such as the United Nations Headquarters. *See generally Housing Works, Inc. v. Kerik*, 283 F.3d 471 (2d. Cir.2002) (discussing City Hall as an area worthy of special protection).

In 1947 the United States entered into the Agreement between the United Nations and the United States of America Regarding the Headquarters of the United Nations (the "Agreement") to ensure the continued security and accessibility of the

---

**2.** Plaintiff also alleges a facial challenge to the New York City parade permit regulations based upon what it describes as a "newly disclosed policy of not issuing permits for protest marches in midtown Manhattan." (Pltf. Memo at 4). According to Plaintiff, it discovered this policy during the deposition of Chief Esposito on February 6, 2003 and plans to amend its complaint to add this claim. While some evidence was adduced on the record at the hearing of a new policy since September 11, 2001 concerning marches in Manhattan South, this issue was not sufficiently developed for adjudication and the Court will not address it. (Tr. 70–74).

United Nations to its members. The United Nations functions seven days a week, particularly to address threats to international peace and security.[3] And, at a time when the United Nations is engaged in a critical role on the question of war with Iraq, the safety of and access to its headquarters is even more essential to assure that its business and its diplomatic missions can be conducted without interruption.[4] The Government's obligation is also to provide police protection and the New York City Police Department ("NYPD") has a specific mandate to ensure the peace and safety of the area directly surrounding the United Nations Headquarters.[5]

Since the terrorist attacks on the World Trade Center on September 11, 2001, the City has banned all demonstrations, parades or other public events in front of the United Nations and the United States Mission.[6] (Esposito Dec. at ¶ 25–26). This policy is all inclusive, makes no reference to the content of the regulated speech, and does not distinguish between event organizers or their views. As such, it is content neutral. *See Ward*, 491 U.S. at 791,

109 S.Ct. 2746 (discussing the requirement that restrictions on speech be content neutral). While it is true that parades and demonstrations, indeed significant ones, have been permitted on First Avenue past the United Nations, the most recent one was in 1994 prior to the events of September 11, 2001.

Of course, in considering whether a total ban on this event's march past the United Nations is a "narrowly tailored" restriction on speech, the Court must determine whether the ban focuses on legitimate security concerns posed by the march and does not restrict more speech than is necessary to satisfy the NYPD's concerns about the jeopardy to United Nations safety and security. The answer is that this march is simply too large for the NYPD to adequately secure the safety of United Nations Headquarters. When questioned on cross examination about the possibility of forming a security buffer to safeguard the United Nations, Chief Esposito explained that despite the fact that there are six lanes on First Avenue and approximately 38 feet between where the marchers would

---

3. *See* Statement of Interest submitted by the United States Attorney for this district.

4. Specifically, under Paragraph 11 of the Agreement between the United Nations and the United States of America regarding the Headquarters of the United Nations ("the Agreement"), the United States is obligated to ensure that members and officials have open access to and from the headquarters. *See, e.g.*, United Nations Headquarters Agreement, at § 11.

5. The Agreement provides:
   the appropriate American authorities shall exercise due diligence to ensure that the tranquility of the headquarters district is not disturbed by the unauthorized entry of groups of persons from outside or by disturbances in its immediate vicinity and shall cause to be provided on the boundaries of the headquarters district such police protection as is required for these purposes.

United Nations Headquarters Agreement, at § 16(a).

6. In fact, this NYPD policy has been in effect in various forms at different times over the last 30 years. (Esposito Dec. at ¶ 26). Even before September 11, 2001, the NYPD banned crowd formations on the east side of First Avenue to ensure the peace and security of the United Nations. Indeed, a district court found that crowd formations heighten security risks and interfere with the United Nations' peace and tranquility and concluded that the ban on religious activities was justified. *Int'l Society for Krishna Consciousness, Inc.v. City of New York*, 504 F.Supp. 118, 121 (S.D.N.Y. 1980). Moreover, restrictions were also upheld in 1971. *See Greenberg v. Murphy*, 329 F.Supp. 37 (S.D.N.Y.1971) (upholding a regulation restricting picketing in front of the United Nations and United States mission).

be walking and the fence to the United Nations, it would be insufficient to provide adequate security for a march with 100,000 people. He stated: "That's just an awful lot—amount of people. If they at one time did something or if somebody in the group had a device, I don't know how we would be able to stop it with that amount of people or see anything." [7] (Tr. 69.)

On the other hand, similarly large marches were previously permitted past the United Nations and new restrictions cannot be permitted on mere speculation about danger. *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1228 (9th Cir.1990). In this case, however, police concerns about security threats posed for the United Nations are far from theoretical. And although the Government does not have to show "an actual terrorist attack . . . to meet its burden," the City has cited to two specific incidents to support its concerns about United Nations security. *Id.* (internal quotations and citations omitted). Evidence that the United Nations complex has already been the target of a failed terrorist plot to bomb a number of New York City landmarks was described in *United States v. Rahman*, 189 F.3d 88 (2d Cir.1999). More recently, in October of 2002, an individual carrying a bag containing political leaflets jumped over the wrought iron gate in front of the United Nations onto United Nations property and fired seven gunshots at the headquarters, breaking windows on the eighteenth and twentieth floors.

This Court finds that the City's refusal to permit the march proposed in this case—past the United Nations—serves a significant governmental interest, the peace and security of the United Nations Headquarters and the U.S. Mission.[8] The Court finds no evidence that the restriction is being applied or justified in any way because of the anti-war message of the marchers. Moreover, the restriction does not prevent protestors from speaking from a platform at a nearby location (49th and First Avenue) and from demonstrating on Dag Hammarskjold Plaza, at 47th Street between First and Second Avenues. This location is at the very northern tip of the United Nations complex and is highly visible from the United Nations [9]

## B. The City's Decision to Ban a March

The City seeks to ban Plaintiff not only from marching in front of the United Nations, but also from marching anywhere in the City. Although the same specific security concerns surrounding the United Nations do not apply to the streets of New York, the City maintains that a ban on marching is necessary in this case, as

7. In a February 9, 2003 letter submission, Plaintiff points out to the Court that the NYPD on September 27, 2002 permitted leafletting to take place in front of the United Nations. Although the Court was not advised of how many leafletters were involved, the difference between some number of individuals being permitted to hand out leaflets in front of the United Nations and 100,000 protesters marching past the United Nations is obvious in terms of the level of security risk presented. Moreover, if at all relevant, it demonstrates that the NYPD in enforcing its post September 11th policy of no demonstrations has attempted to narrowly tailor their restrictions to meet security needs.

8. The United States Mission is on the west side of First Avenue opposite the United Nations and its ability to conduct its affairs and to be secure is an additional consideration in assessing security concerns posed by the proposed march.

9. This litigation has focused solely on the constitutionality of restricting a march past the United Nations *in the manner proposed by the organizers of this event*. The Court expresses no view on the constitutionality of a ban or other restrictions on any other type of demonstration.

Plaintiff's proposed march poses an unreasonable risk to public safety.

The Court has considered the testimony of Chief Esposito in support of this assertion and finds the following facts. Any event involving a large number of people presents a risk to safety and security. This risk can be reduced to a reasonable one through planning, security measures and policing. The Court credits the city's assessment that the NYPD could not responsibly plan security for a march of this magnitude with only the limited amount of information that the organizers have offered the NYPD at this late point in the planning process. (Esposito Dec. at ¶ 9, 22). While it could prepare for a march of much smaller size with limited information and on short notice,[10] with the large numbers expected in this case, it believes it can better protect public safety by permitting a rally as opposed to a moving procession. (Tr. 42).

Plaintiff argues to this Court that the City has denied Plaintiff the right to march specifically because it is a protest march as opposed to a "cultural" parade. Plaintiff points to the City's issuance of parade' permits in the past year for the Dominican Day parade, which had 100,000 participants; the Puerto Rican Day parade, which had 100,000 participants; and the Saint Patrick's Day parade, which had 120,000 participants. Plaintiff maintains that the City's decision to deny it a large scale march when it regularly grants permits for cultural events amounts to an impermissible regulation based upon the content of the speech. *Forsyth Country v. The Nationalist Movement*, 505 U.S. 123, 135, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).

The Court disagrees and finds the ban content neutral. The Court finds that Plaintiff's proposed march is markedly different than the large scale annual parades that the City hosts. (Esposito Dec. at ¶ 11). Annual parades are regular events with which the NYPD has substantial experience. For such events, the NYPD also has a firm notion of the turnout based on past attendance records. Annual parades provide the NYPD with the opportunity to conduct visual security checks and, with the assistance of parade marshals, identify the members of a groups as they arrive at their respective staging areas for the parade. (Tr. 138).

The City offered the planning procedures associated with the Saint Patrick's Day Parade as an example of the planning usually undertaken by the police to ensure the safety of participants and the public for large scale marches. Chief Esposito explained that "long before the event the organizers would submit an application for the parade. They would tell us exactly when they want the parade, what time of the day, how many participants will be there, how many organizations will be there." (Tr. 35). Thereafter, the police conduct several meetings with the organizers to establish the "formation blocks," which are the street blocks to which groups are assigned for entry into the parade. (Tr. 35, 37). The police know who the leaders are in each block to contact in an emergency or for organizational issues. (Tr. 38) These groups then enter onto the march route at different times to ensure proper spacing and crowd manage-

---

10. Chief Esposito remarked that:
    [n]ormally we are talking 1,000, 1,500, 2,000. If you overestimate and 1,000 come or you underestimate and 2,500 come, it is not ... too much of a problem to the police department. If you tell me that 50[,000] to 100,000 are coming and you are trying to get a lot more and 150,000 come, I have a very, very big problem.
    (Tr. 56). *See also* (Tr. 55–56).

ment. (Tr. 37, 42). These groups are separated by sufficient space during the march so that emergency lanes are preserved for police access to both the marchers and the local community. (Tr. 42; Esposito Dec. at ¶ 29).

In contrast, Plaintiff came to the City only three weeks ago with its request for a march to include potentially over 100,000 persons. (Cagan Aff. at ¶ 5). Plaintiff has continued to change its estimate of the number of expected protesters, offering ranges from 50,000 to 100,000 to 150,000 people, (Tr.58), and its website suggests its hope that hundreds of thousands will attend the event. (Def.Ex. A). Ms. Cagan testified that she has not and still could not provide the police department with "specific information about numbers of participants." (Tr. 21). For example, she frankly explained that while she believed 150 buses would be bringing participants to New York City, she could not be sure whether a number of these buses had been cancelled due to uncertainty regarding the permit or whether more buses might be chartered. (Tr. 12).

In addition, the City has had insufficient time to prepare with any security volunteers and with groups leaders of various contingents that intend to march. While Plaintiff has provided the City with a list of names of 360 organizations that intend to participate, it has not yet provided the City with the names of contact individuals for those different organizations and groups. (Tr. 127, 133). Chief Eposito credibly recounted the City's position with regard to the unique combination of size and uncertainty when he stated his concern with

> [t]he size of the crowd, especially the size of the crowd that [is] unknown to

us. That application showed 50,[000] to 100,000. Then we were told it might be much more than 100,000. I asked, Can you give us a list of all the organizers? Can you really tell us how many are going to be there? And they said, No, we can't. We don't really know. This is going on all over the country. We expect people to come in from all over the country. They couldn't give me any specifics at all to that. So the size of that was a large problem. That crowd, that number marching through where they wanted and not knowing how many would be there would be very difficult to police ... It would be very difficult to do.

(Tr. 40).

Further, the lack of more exact figures and names of personnel to contact create a likelihood that participants will descend at the march's starting point at the same time. (Tr. 43). A large crowd at the starting point could lead to dangerous surges in the crowd as participants vie to be at the front of the march. (Tr. 43). Police anticipate trouble controlling such surges throughout the entire march, creating a continuing risk of injury to participants themselves, especially children.[11] (Tr. 43). In short, this proposed march

> does not have the discipline of an organized line or march where there is an established, carefully planned and paced sequence throughout the parade route. As such it is more difficult to control the progress of the procession, especially if there is a need to respond to unexpected events such as injuries, disruptions, or other emergencies in the surrounding community.

(Esposito Dec. at ¶ 29).

Plaintiff disputes this assessment of its preparedness. Ms. Cagan testified that

---

11. Chief Esposito noted that there are often children in events such as these, creating special concerns for the police. In addition, Ms.

Cagan informed the Court that organizers of the event plan to have a contingent of children march toward the front of the line.

she was planning this event just as she did the other successful marches she organized in the past, some of which occurred in New York City. (Tr. 127–130; Cagan Aff. at ¶ 10–15). To be sure, Ms. Cagan is in the process of recruiting volunteers to serve as peacekeepers and marshals for the event and renting walkie talkies for communication purposes, however, she has yet to turn over specific information regarding the names and contact information of such persons to the City. (Tr 126, 133). She corroborates the police department's concerns when she concedes that large protest marches often do require long term planning. (Tr. 16–17). In fact, the large 1994 Stonewall march, for which Ms. Cagan was a coordinator, required months of planning and grew out of an annual march. (Tr. 29; Cagan Aff. at ¶ 11). She also acknowledged that the organization for this march was "on a fast track," and that "[she has] actually never been involved in a large demonstration like this so quickly." [12] (Tr. 29).

While the organization of large protest marches may never replicate the practiced coordination of annual parades, the evidence demonstrates that more planning than is present here is needed to ensure the safety of participants and the public. The Court recognizes world events dictate a rapid organization in this case. Indeed, it also recognizes that safety concerns will likely arise whenever there is a march dedicated to a pressing world event that engenders such great public support that over 100,000 participants are expected. These considerations, though, do not mitigate against the City's reasonable and legitimate safety concerns.

The City's concerns with respect to crowd control are exacerbated by the add-

ed security concerns since September 11, 2001. (Esposito Dec. at ¶ 27). The nation and the City are currently at the second highest security alert, a fact that the NYPD must take into account in determining the level of risk. The police can more effectively monitor crowds for terror threats at stationary rallies than they can crowds moving in a procession, which is the reason that the NYPD prefers a stationary rally in this case. (Tr. 42).

Again, Plaintiff argues that this preference cannot be a basis for prohibiting its march, as the City has permitted large scale cultural and celebratory marches since September 11th. In fact, it notes that the City intends to permit the Saint Patrick's Day parade, with upwards of 100,000 participants, to proceed next month. Plaintiff argues that there is nothing to distinguish the policing difficulties, including heightened terrorist concerns, when policing a parade than when policing the type of march contemplated here.

Despite Plaintiff's contentions, the Court credits the City that there are critical differences between monitoring a well formed parade of marchers who step out in a timed manner and proceed at a set pace and monitoring a procession of marchers not organized in a traditional parade format. In a parade, police officers have predetermined formation blocks where they can survey a crowd for terrorist devices. (Tr. 42). They can also more easily monitor groups as they proceed through a parade route than they can monitor a march of 100,000 plus individuals with uncontrolled crowd formations. Such a march also poses much greater difficulty in observing and tracking suspicious activity. Consequently, the Court finds that height-

---

**12.** During this testimony, Ms. Cagan expressed her confidence in the NYPD's ability to safely police her organization's proposed march. While the history of New York's suc-

cessfully policed marches and parades undoubtedly reflects the NYPD's expertise and ability, this is but another reason to credit their concerns about this march.

ened security concerns due to September 11th are an additional element of the City's overarching concern that it cannot safely protect the public if a march proceeds as it is currently proposed. This protest march is simply different in kind than an annual parade or a protest march that has been organized over a longer period of time.[13]

The City has, thus, emphatically made its case to the Court that it cannot responsibly undertake the facilitation of this march without great risk to the participants themselves, the public, and its own officers. The Court gives great weight to Chief Esposito's judgment, which is based on 25 years of experience with such events, that the City cannot safely monitor a 100,-000 person march organized in such a short amount of time. The Court will not second guess or substitute its judgment for that of the NYPD. The Court recognizes that it should not "kowtow without question to agency expertise," but it considers the reasons offered by the City in this case to legitimately implicate the significant government interest of public safety. *Olivieri v. Ward*, 801 F.2d 602, 606 (2d Cir.1986).

Accordingly, the Court finds that the heightened security concerns posed by an unorganized, large scale march threaten the City's interest in maintaining the public safety. This is a significant governmental interest that warrants the City's denial of a parade permit in this case. *See, e.g., Million Youth March, Inc. v. Safir*, 63 F.Supp.2d 381, 394 (S.D.N.Y. 1999) (citing *Million Youth March v. Sa-*

*fir*, 18 F.Supp.2d 334, 335 (S.D.N.Y.1998)) ("The City has a significant interest in regulating 'street activity to protect the public safety.'"); *United Yellow Cab Drivers Assoc'n, Inc. v. Safir*, No. CIV.A. 98-3670, 2002 WL 461595, at *8 (S.D.N.Y. March 22, 2002) (stating that the government "has a significant interest in preserving public order and safety."); *Olivieri v. Ward*, 801 F.2d 602, 607 (2d Cir.1986) (same). Moreover, the City's decision to ban the march but permit a stationary rally is narrowly tailored to address the risks as assessed and goes no further than necessary to that end. "[I]t focus[es], as required, on the source of the evils to be eliminated without restricting significantly a substantial quantity of speech not involving the same evils." *Housing Works, Inc. v. Kerik*, 283 F.3d 471, 481 (2d Cir.2002).

The Court next turns to the question of whether the City has provided Plaintiff with ample alternative channels for communication. The Court finds that it has. Plaintiff has requested an event that includes an assembly, a march and a rally. As previously mentioned, the City has offered as an alternative a stationary rally in Dag Hammarskjord Plaza, which is located at 47th Street and First Avenue, and on First Avenue beginning at 49th Street and running as far north as required to accommodate an unlimited number of participants at the event.[14] The Court finds that this alternative is reasonable because it will allow Plaintiff ample opportunity to express its views in close proximity to the United Nations.

---

**13.** The Second Circuit has instructed that a district court is to consider "not what the City is 'physically capable of doing,' but rather [should conduct] an in-depth consideration of all relevant circumstances, including 'public health, safety, convenience, and cost.'" *Million Youth March v. Safir*, 63 F.Supp.2d 381, 394 (S.D.N.Y.1999) (citing *Million Youth March v. Safir*, 155 F.3d 124, 126 (2d Cir. 1998)). In its decision to deny Plaintiff's

march, the City does not rely on arguments of cost or convenience.

**14.** Plaintiff initially requested an assembly near the United Nations with a march past the United Nations, ending in a rally to be held in Central Park. Because of this, the litigation focused solely on the march restrictions and the alternative of a stationary rally up First Avenue. There is nothing in the

Plaintiff, on the other hand, highlights the significance of the march itself, calling the march "a time honored tradition in New York City and perhaps the single most important method of demonstrating large public support for a particular cause." (Cagan Aff. at ¶ 7). Plaintiff asserts that a march, unlike a rally, would allow people to actively participate by walking, carrying signs, chanting and singing. (Tr. 8). Plaintiff also argues that at a stationary rally, the discreet contingents participating in the event cannot be readily identified. (Cagan Aff. at ¶ 7). Moreover, Plaintiff contends that far fewer people will attend, or stay at, a stationary rally because of the cold weather.[15] (Cagan Aff. ¶ 7; Tr. 9).

While the Court recognizes the distinct importance of marching, the City's restriction on marching is not a restriction on pure speech, but rather a restriction on the *manner* in which Plaintiff may communicate its message. Ms. Cagan concedes that there are examples throughout history when strong statements have been conveyed at stationary rallies. (Tr. 12). Ms. Cagan also concedes that it is possible to identify contingents within the rally area and that the rally could be organized in such a way as to allow people to participate by singing and chanting. (Tr. 23, 25).

Further, the City's alternative will enable Plaintiff to communicate its message at a desirable location—in close proximity to its target audience, the United Nations. *See Concerned Jewish Youth v. McGuire,* 621 F.2d 471, 477 (2d Cir.1980) (noting that there is little real effect on the legitimate expression of ideas when plaintiff allowed to demonstrate and convey its feel-ings within sight, albeit not in front of, the Russian Mission, plaintiff's target audience). Moreover, the City's proposal does not limit the number of participants who may attend the event. Therefore, the City's restriction "impose[s] only a minimal inhibition on the ability of [Plaintiff] to communicate its ideas...." *Housing Works, Inc. v. Kerik,* 283 F.3d 471, 481 (2d Cir.2002) (quoting *Concerned Jewish Youth,* 621 F.2d at 476).

Significantly, Plaintiff is not entitled "access to every or even the best channels or locations for their expression." *Carew–Reid v. Metropolitan Transp. Auth.,* 903 F.2d 914, 919 (2d Cir.1990) (citing *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 812, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). Determining "[w]hether ample alternatives are available does not depend on the preference of the speaker for one method [of communication] or another." *Irish Lesbian and Gay Organization v. Giuliani,* 918 F.Supp. 732, 744 (S.D.N.Y.1996). Moreover, the City's restriction on the time, place or manner of speech "need not be the least restrictive or least intrusive means of doing so." *Ward v. Rock Against Racism,* 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

The Court realizes that Plaintiff does not believe the City's alternative will be as beneficial to Plaintiff in delivering its message compared to Plaintiff's requested event. This does not, however, negate the fact that significant alternative channels exist. *See Housing Works,* 283 F.3d at 481–82. In sum, the Court concludes that the City's restrictions will not impede Plaintiff's ability to convey its message to

---

15. record, however, to justify a restriction on a stationary rally in Central Park. Presumably, the NYPD proposed the First Avenue location as an alternative to Central Park because of its assumption that the organizers would prefer their rally near the United Nations.

15. The First Amendment, however, does not guarantee "news publicity for speakers nor does it guarantee the continued fervor of one's fellow demonstrators." *Concerned Jewish Youth v. McGuire,* 621 F.2d 471, 474 (2d Cir.1980).

the representatives of the United Nations. The City's significant interest in the safety of the public, the event participants, and the police officers, especially in this time of heightened security, outweigh the restrictions placed on Plaintiff. Accordingly, the City's denial of Plaintiff's permit application does not violate the First Amendment.

## VI. CONCLUSION

Because Plaintiff has failed to establish a clear or substantial likelihood of success on the merits, the Court denies Plaintiff's motion for a preliminary injunction.

The foregoing shall constitute this Court's findings of fact and conclusions of law. The Clerk is directed to enter judgment in favor of Defendants.

**So Ordered.**