LIPEZ, Circuit Judge,
concurring.
I concur fully with the thoughtful opinion of Judge Selya. I write separately to *16 emphasize some important lessons that I believe should be taken from this case.

1.Timing

Time constraints shadowed every aspect of this case. In the future, if the representatives of demonstrators ask the courts to modify security measures developed over many months of planning for an event of this magnitude, they should come to court when there is enough time for the courts to assess fully the impact that modifications will have on the security concerns advanced. Inevitably, the absence of time becomes an important element in determining whether a given time-place-manner restriction is narrowly tailored to serve a government interest in maintaining security. See United for Peace & Justice v. City of New York, 323 F.3d 175, 178 (2d Cir.2003) (noting that “short notice [and] lack of detail ... are always relevant considerations” in a First Amendment narrow tailoring analysis).
According to an affidavit in the record, discussions on arrangements for demonstrations began in July 2003 between the city and interested parties, including the American Civil Liberties Union and the National Lawyers Guild, which are counsel for the appellant in this action. The city undertook to provide a designated demonstration zone within sight and sound of the DNC delegates. The parties agreed that the area that had been set aside for the delegates’ buses would be modified to accommodate the placement of the demonstration zone. Subsequently, there may have been misunderstandings about agreements that had been reached. Perhaps there were unjustified reliances on verbal representations. The record does not permit any judgment on the history of negotiations. However, for an event of this magnitude, taking place at a time of heightened national security, there is an inescapable need for firm, documented understandings well in advance of the event about arrangements to accommodate demonstrations. If the parties cannot reach satisfactory agreements, there must be adequate time to seek recourse in the courts. Adequate time means months or at least weeks to address the issues. It does not mean five days before the event begins.
2. Choice of Site
The district court has described in detail the physical limitations of the Boston site of the Democratic National Convention, noting that the DZ “is the only available location providing a direct interface between demonstrators and the area where delegates [would] enter and leave the Fleet Center.”[6] These site limitations reduced dramatically the options available for accommodating the First Amendment rights of protesters and the security concerns of the event. The record does not disclose the attention given to the rights of demonstrators in the selection of the Fleet Center for the convention. In the future, however, some of the problems that bedeviled the demonstrators and the planners here, and the court in considering the possibility of relief, might be ameliorated if the venue chosen for the gathering allowed a variety of solutions to the competing concerns of the parties. Once a site is chosen, geography can dominate the legal analysis.
3. Event Specific Intelligence
The district court justified the security measures at issue here on the basis of “past experience at comparable events, in- *17 eluding the 2000 DNC in Los Angeles.” The district court added:
We have come to a point where it may be anticipated, at this and similar national security events, that some significant portion of the demonstrators, among those who have the closest proximity to delegates or participants, consider assault, even battery, part of the arsenal of expression. And as a consequence, those responsible for event safety must plan for violence. In fact, the chance of confrontation with the security measures themselves is viewed by some as a further opportunity for expression.
These references by the district court to experiences at comparable events, and its statement that there was reason to fear similar violence from some of the demonstrators at this convention, drew the particular ire of the appellant who challenged “the imposition of Draconian restrictions on the exercise of First Amendment rights on the basis of anecdotal information of disruptions and civil disobedience that have occurred at other places, at other times, and under other circumstances.”
It is true that unfounded speculation about potential violence cannot justify an insufficiently tailored restriction on expression. See, e.g., Bay Area Peace Navy v. United States, 914 F.2d 1224, 1228 (9th Cir.1990) (seventy-five yard security zone separating demonstrators from naval parade was not narrowly tailored to serve governmental interest in preventing terrorism when the asserted threat was speculative and unconnected to incidents in the San Francisco Bay area or the United States). On the other hand, as Judge Selya notes, law enforcement officials may appropriately draw upon experiences of other cities or entities that have hosted comparable events when assessing the type of security measures necessary to police an upcoming event. See Grider v.
Abramson, 180 F.3d 739, 743-44 (6th Cir.1999) (concluding that town’s security plan developed in anticipation of KKK rally and counter-rally by opposing groups, in consultation with “the distilled essence of [other municipalities’] collective advice,” was narrowly tailored to the government’s interest in protecting the safety of both groups and the public). The reality that some demonstrators at the 2000 DNC and other recent large, political events have pushed over fences, squirted bleach and urine at delegates or attendees, and thrown objects over barricades, was clearly relevant to the safety risk posed to delegates and others at the 2004 DNC. At the same time, the absence of specific information in the record about risks of violence specific to this event remains troubling in light of the particularly stringent restrictions on expression that were imposed. Cf. United for Peace and Justice v. City of New York, 243 F.Supp.2d 19, 25 (S.D.N.Y.) (relying on evidence that United Nations building had been the target of two recent security incidents in upholding denial of permit to march in front of United Nations building as narrowly tailored restriction of First Amendment activity), aff'd 323 F.3d 175 (2d Cir.2003).
The district court recognized the importance of event specific intelligence. As the court disclosed in its initial bench ruling, and as it confirmed in its written decision, the court
inquired of both the City and the United States whether they had any specific intelligence concerning security threats during the DNC. The United States indicated that it did, and would be willing to provide that information to me ex parte and in camera, but was unwilling to provide the information in the presence of plaintiffs’ counsel, even with a protective order, because of concern re *18 garding the potential difficulties for law enforcement and various investigations.
As the district court further explained, it met with representatives of the United States, received information that is reflected in the court reporter’s notes and then, in light of the objections posed by the appellant to the consideration of that information, stated that it would not consider the information received during the ex parte meeting in its decision on a request for a preliminary injunction. Yet the district court did say in its written decision: “I should add, for purposes of completeness, that nothing in the information received suggested that the disposition of the Bl(a)ck Tea plaintiffs’ motion was improvident.” The stenographer’s notes of that ex parte meeting were placed under seal and were, in the words of the district court, “available to prepare a transcript should judicial officers need to review them in connection with any appeal.” We have not sought such review.
Neither party challenged the district court’s participation in the ex parte meeting, and I do not question the court’s statement that the information it received from the United States played no role in its decision. I do understand the district court’s “improvident” observation to mean that the information it reviewed ex parte confirmed, in its mind, the rightness of the decision it made independently of that information. This distinction captures the difficulties involved in trying to fashion a workable procedure under impossible time constraints that would allow the court to receive the event specific information it ideally should have while both protecting the confidentiality of that information and allowing the appellant to challenge it in some fashion.
I do not presently have an answer to this dilemma. I only know that the dilemma is one of considerable import. We have recognized the general proposition that “[o]ur system of justice does not encompass ex parte determinations on the merits of cases in civil litigation.” Assoc. for Reduction of Violence v. Hall, 734 F.2d 63, 67 (1st Cir.1984). Yet some precedents from other circuits suggest that ex parte determinations may be allowable “when the submissions involve compelling national security concerns or the statute granting the cause of action specifically provides for in camera resolution of the dispute.” Vining v. Runyon, 99 F.3d 1056, 1057 (11th Cir.1996); see also Molerio v. FBI, 749 F.2d 815, 825 (D.C.Cir.1984). Although we have not had occasion to consider whether compelling national security concerns may in exceptional circumstances justify the ex parte consideration of privileged information, this case might have presented an opportunity to address the issue. As the district court noted, the DNC was designated by the President as a National Special Security Event, with the Secret Service designated as the lead federal agency in the design, planning, and implementation of security measures. However, so far as I can tell, there was no attempt by defendant to establish the factual predicates for this national security exception. Thus, the record is devoid of intelligence specific to this event.
While fully acknowledging the difficulty of the issues involved, I think that void is unfortunate. It should not be the rule in these kinds of cases. With more time to prepare for these cases, and with some creative thought given to procedures that might allow the fair consideration of such event specific intelligence, there could be less reliance in the future on the inferences drawn from prior events.
4. Post-9111 Environment
At the outset of its written decision the district court placed the controversy before it in context:
*19 The DNC will be the first national political convention to be held following the September 11, 2001 terrorist attacks on New York’s World Trade Center that were launched from Boston’s Logan Airport. It has been designated by the President as a National Special Security Event, and, in light of recent experience with such events, the Secret Service and the Boston Police Department have developed extraordinarily stringent security measures in connection with it.
Inevitably, the events of 9/11 and the constant reminders in the popular media of security alerts color perceptions of the risks around us, including the perceptions of judges. The risks of violence and the dire consequences of that violence seem more probable and more substantial than they were before 9/11. When judges are asked to assess these risks in the First Amendment balance, we must candidly acknowledge that they may weigh more than they once did. See United for Peace and, 243 F.Supp.2d at 29 (recognizing that “heightened security concerns due to September 11th are an additional element of the City’s overarching concern that it [could not] safely protect the public” if a proposed march past the United Nations were to take place). When the district court commented that there are aspects of this case that are “irretrievably sad,” the court surely had this new reality in mind.
I wish to be clear. I am not suggesting that this new reality makes the First Amendment rights of the demonstrators any less important or the vigilance that the courts must have for those rights any less imperative. But I am suggesting that the always difficult balancing between those First Amendment rights and the demands of security has become even more difficult.
Thus I return to the point where I began — the inescapable need for judges and litigants to have adequate time to resolve these difficult First Amendment/security issues. Although the district court did a superb job under difficult circumstances of analyzing the competing interests at stake and offering its best judgment as to how those interests must be addressed, the press of time inescapably constrained its ability to grant any of the relief sought by the appellant. For us, even further removed from the scene and from the facts, and with the Convention already under way, the constraints were even greater.
There is good reason for the district court’s lament that “the design of the DZ is an offense to the spirit of the First Amendment.” In the future, with more time for court intervention when court intervention is needed, with the choice of more flexible sites by event planners, and with procedures in place for giving the court the event specific information it should have, that spirit, hopefully, will not be offended again.

. These limitations assume the presence of the "hard zone,” which is not at issue in this appeal.